[No. B219424. Second Dist., Div. Seven. Nov. 2, 2010.]

In re MICHAEL McDONALD on Habeas Corpus.

COUNSEL

Edmund G. Brown, Jr., Attorney General, Julie L. Garland, Assistant Attorney General, and Kim Aarons, Deputy Attorney General, for Appellant State of California.

Nancy Tetreault, under appointment by the Court of Appeal, for Respondent Michael McDonald.

OPINION

**WOODS, J.—**

### SUMMARY

We find the Governor's reversal of the decision by the Board of Parole Hearings (Board) to grant parole to Michael McDonald is not supported by any evidence McDonald currently poses an unreasonable risk of danger to society. Accordingly, we affirm the trial court's grant of the petition for writ of habeas corpus.

### FACTUAL AND PROCEDURAL SYNOPSIS

A jury convicted McDonald and Kenneth German of the second degree murder of 16-year-old Alexander Geraldo; both McDonald and German appealed.[1] German's conviction was reversed, but McDonald's was affirmed. According to the appellate decision (which was read into the record at McDonald's parole hearings), the following evidence was presented at trial: "In December 1991, German was home on leave from the Army. Prior to returning home for the holidays, he had received word that his girlfriend was spending time with [Geraldo]. At a party on December 27, 1991, at Neilson Hul's house, attended by a group of friends with ties to Long Beach Poly High School, particularly the school's R.O.T.C. program and the social organization known as the Ace[s] of Spades, German is quoted as saying several times that he wanted to kill the victim [Geraldo]. There was some discussion at the party about [Geraldo] helping the police investigate an automobile burglary involving Chavares McNary and [Geraldo]. That night McNary beat up [Geraldo].

---

[1] German was also convicted of conspiracy to commit murder. McDonald's previous conviction of second degree murder was overturned on appeal due to jury misconduct.

The victim's name is spelled both "Geraldo" and "Giraldo" in the record.

"The next night German, Jesus Cast[a]n[e]da, Jack Steele and Nielson Hul went to [Geraldo's] house, lured him outside, and German beat [Geraldo] up because of a belief that [Geraldo] had earlier scratched German's vehicle. Evidence was presented that the members of the group with German were armed with pepper spray and had intended to kill [Geraldo]. The plan was foiled by the presence of appellant McDonald who was not then part of the plan.

"Later the same night a meeting involving German, Cast[a]n[e]da, Hul, Steele and McNary took place. German ran the meeting and ultimately directed McNary and Hul to kill [Geraldo].

"The next day, according to Cast[a]n[e]da, he and German discussed killing [Geraldo]. German wanted [Geraldo] dead because of his flirtation with German's girlfriend and because [Geraldo] had helped the police.

"Shortly thereafter German returned to the [A]rmy.

"On the morning of February 2, 1992, the body of [Geraldo] was found 15 to 20 feet down a cliff near the ocean in San Pedro. Found near the body was a guitar string with a washer attached. There were signs of a struggle. The deputy medical examiner determined the cause of death to be a combination of the effects of ligature strangulation, consistent with guitar string and stab wounds to the neck. He gave the time of death to be between 8:00 p.m., February 1 and 7:00 a.m., February 2.

"The prosecutor's theory was that German directed and conspired with others to commit the murder from his far off army post. This view was unsuccessfully disputed by German. The prosecution offered evidence that McDonald was more directly involved with the murder. Indeed evidence was offered showing that the guitar strings found near the victim and believed to be the murder weapon were not inconsistent with the guitar strings later found at McDonald's home. In addition to physical evidence, the prosecution offered the testimony of witness Adam Stocks that McDonald admitted to having participated in the killing of [Geraldo]. According to Stocks, McDonald elaborated further and explained that [Geraldo] was killed by means of strangulation, beating and being thrown off a cliff. At trial, McDonald offered a 'time line alibi' defense which was unsuccessful."

According to McDonald's probation report, "From what can be determined, Kenneth German, Jay Castaneda, Nielson Hul and a couple other R.O.T.C. members" formed the " 'secret' " group known as the " 'Aces of Spades,' " which punished any violation of its "perverted 'Code of Silence.' " Although German was a couple of years older and already out of

school and in the military when the crime occurred, he "had influence" and "was their leader." "Following an intensive investigation where police interviewed hundreds of witnesses, McDonald, Chavares McNary, Bryan Davis and Schuyler MacPherson were arrested. MacPherson was the only adult . . . . McDonald and Davis were eventually found unfit by the Juvenile Court; and . . . MacPherson and Davis were found not guilty by jury while McDonald was convicted of second degree murder. . . ." A "jury misconduct matter" caused the conviction to be overturned.

In the meantime, new information implicating German was discovered, and he was later arrested and charged once his significant role in the murder was determined. When police first spoke with German, he "apparently first thought the assailant had been Jay Cast[a]n[e]da because he . . . was 'real crazy.' " However, he later said he recalled conversations with McDonald "whom he said sounded angry at the victim for stealing or not sharing something with him." He remembered McDonald describing Geraldo in "unflattering terms" and saying "he wanted to 'take care of him.' " This may have occurred at the December 1991 party when he was home on leave he said. German said he had not taken McDonald "too seriously because [McDonald] was not a member of the 'Aces of Spades' but wanted to merely hang around with them (per reports)." "After McNary was arrested, he said on the day of the murder MacPherson and Davis picked both [McNary] and McDonald up . . . and went over to McDonald's house where McDonald cut a length of wire from a spool in his garage and put a washer on the end of it. They had planned on picking up the victim and beating him up again because he had 'snitched.' He said the wire was to 'hang his ass' (per reports). Because McNary did not believe that [Geraldo] would get into the same car with them because of their earlier problems, they drove him first to the 'cliffs', dropped him off and returned to the victim's house to pick him up."

"Interesting to note," the probation report continued, "McNary later told the police after the suspects returned, he saw Davis and McDonald beat [Geraldo] to the ground and observed McDonald strangle (garrote) him. He also saw Davis aid in the strangulation and dragging and eventually tossing the body over the cliffs."

"Needless to say," the probation report stated, "the police found a great deal of conflicting and self-serving statements throughout this lengthy investigation, some of which undoubtedly led to the not guilty verdicts of some of the defendants."

In April 1996, Castaneda contacted a police detective and gave a statement about the events surrounding Geraldo's murder, and said the Aces of Spades had pretended to be friendly with Geraldo so he would not be suspicious

before the murder. He said German had ordered McNary and Hul to kill Geraldo because it was their turn to prove themselves, but McNary told him (Castaneda, who was not present) Hul could not go through with it, so McNary took McDonald and recounted McDonald's role in the killing. According to Castenada, "though [Geraldo], Chav[a]res McNary, Nielson Hul, Adam Stock[s], Ying Cha, Jack Steel[e] and Ken German were 'Ace[s] of Spade[s]' member[s], they still associated and did crimes with non-members." Geraldo was "better friends" with McDonald, MacPherson and Davis.

At McDonald's trial, after Castaneda invoked his Fifth Amendment right not to incriminate himself, the prosecutor read Castaneda's prior testimony from a pretrial evidentiary hearing to the jury. While this was found to be error on appeal as McDonald and German were deprived of the opportunity to cross-examine Castaneda to challenge his credibility and establish his bias, the error in introducing Castaneda's testimony was found to be harmless beyond a reasonable doubt in light of Aces of Spades member Adam Stocks's testimony and the guitar string found at McDonald's home.

According to McDonald, Geraldo was his best friend. He had argued with Geraldo over his involvement with the Aces of Spades, telling him it was either him or the group, and Geraldo decided to stop hanging out with the Aces of Spades. After that, he and McDonald started to have "friction" with the group. His grades dropped and he tried to drop out of ROTC (Reserve Officers' Training Corps), but he was told he had to complete the semester. In an effort to ease the tension, McDonald said, he spoke with Aces of Spades member McNary and worked out a "peace agreement" between Geraldo and the Aces of Spades. Based on what McNary told McDonald, he thought he and Geraldo no longer needed to fear the Aces of Spades.

On the night of the crime, McDonald said he had made plans to meet with Geraldo but Geraldo cancelled to spend time with his girlfriend. McNary then asked McDonald to go to the movies with him and he agreed. Davis and MacPherson picked up McDonald and McNary and took them to the movies but did not attend the movie themselves. McDonald and McNary returned to McDonald's house around 11:00 p.m., and McNary spent the night on McDonald's floor. He did not learn of Geraldo's death until his teacher told him at school the following week. He was arrested four months later after Aces of Spades members implicated him in the crime.

He said he felt responsible for Geraldo's death because the Aces of Spades used him to get Geraldo to let his guard down but denied involvement in planning or carrying out Geraldo's murder. However, if he (McDonald) had not attempted to work out a peace agreement, he said, Geraldo would not

have trusted the Aces of Spades enough for them to get close enough to hurt him. He maintained his version of events despite plea offers from the district attorney and two prior reversals by the Governor of the Board's grants of parole. He said he had offered twice to take a polygraph but was told it was inadmissible in court as it could be faked. "You can't change the truth," he told the Board. On August 14, 2008, after questioning McDonald at length about his account and the Governor's objections to his parole release, the Board again found McDonald suitable for parole.

In January 2009, for the third time, the Governor determined McDonald's release would present an unreasonable public safety risk, based on the particularly aggravated nature of the premeditated crime and McDonald's lack of insight based on his claim of limited responsibility. "At age 33 now, after being incarcerated for more than 16 years of his 15 to life sentence, Mr. McDonald made some creditable gains in prison. But given the current record before me, and after carefully considering the very same factors the Board must consider, I believe his release from prison would pose an unreasonable risk of danger to society at this time."

McDonald filed a petition for writ of habeas corpus challenging the Governor's reversal. In granting the petition, the trial court noted (as the Board had done), McDonald, who was convicted primarily on the basis of testimony from members of the Aces of Spades, was 16 at the time of the commitment offense. He had no prior criminal record and no history of misconduct at school. He did not have a problem with drugs or alcohol. He had been a model prisoner who had never been disciplined for serious misconduct in prison. He had been counseled in 2000 for having more than six cubic feet of paper, apparently due to his possession of his trial transcripts. He had participated extensively in self-help. He was a Catholic chapel clerk and a facilitator for the Alternatives to Violence program. He had also participated in Cage Your Rage, anger management, advanced anger management and Celebrate Recovery among other programs.

He earned his GED (general equivalency diploma) in 1993 and earned his high school diploma in 1995. He earned an A.A. (associate in arts) degree in liberal arts in 2005. He had vocational certificates in heating and air conditioning, paralegal studies and refrigeration. His psychological evaluations were supportive of release. "[I]t appears that the psychologist believes [McDonald] was not involved in the commitment offense." He was rated as a low risk for future violence. He had adequate plans for release, including two offers of residence—one from the investigator who worked on his case for trial who also believed in McDonald's innocence. In the alternative, he could live with family in Tennessee or North Carolina if he were able to obtain a transfer. His church had offered him employment.

The trial court noted the Board had found McDonald suitable for parole twice before, in 2006 and 2007, but the Governor had reversed both decisions based primarily on the commitment offense and McDonald's lack of insight and remorse. While the Governor could rely on the gravity of the commitment offense as it relates to future dangerousness, the trial court stated, and there was some evidence to find the crime especially heinous, atrocious and cruel, the aggravated nature of the crime is insufficient, in and of itself, to provide some evidence of current dangerousness. (*In re Lawrence* (2008) 44 Cal.4th 1181, 1214 [82 Cal.Rptr.3d 169, 190 P.3d 535].)

"In this case, there is no rational nexus between the commitment offense and [McDonald's] current level of dangerousness. Nothing in [his] pre- or post-conviction history indicates that he remains a danger to society. He was never involved in criminal or antisocial behavior prior to the commitment offense. It appears he was a good student and member of his high school ROTC program. He has been a model prisoner without any disciplinary problems throughout his incarceration. He has taken steps to rehabilitate himself through self-help and has improved his education and developed marketable skills. According to his psychological evaluation, there is a low risk that he will become violent if released.

"An inmate's lack of remorse or insight into the nature and magnitude of the offense may be some evidence that he currently poses an unreasonable risk of danger to society. (Cal. Code Regs., tit. 15, § 2402, sub. (d)(3); *In re Shaputis* [(2008)] 44 Cal.4th [1241,] 1260 [82 Cal.Rptr.3d 213, 190 P.3d 573].) However, 'the Board is precluded from conditioning a petitioner's parole on an admission of guilt.' (*In re Palermo* (2009) 171 Cal.App.4th 1096, 1110 [90 Cal.Rptr.3d 101]; Pen[.] Code, § 5011, subd. (b); Cal. Code Regs., tit. 15[,] § 2236.) The Governor contends [McDonald] lacks insight into the nature and magnitude of the offense because he denies involvement. Other than the gravity of the commitment offense, this lack of insight is the only basis for the Governor's reversal of parole. . . . 'I do not accept Mr. McDonald's claim of limited responsibility. And his lack of insight indicates to me that he would pose an unreasonable risk of danger to society if released from prison at this time.' . . . This statement demonstrates that the Governor is conditioning the grant of parole on [McDonald's] admission of guilt. Since this is precluded by Penal Code section 5011[, subdivision] (b), it cannot be used as some evidence to support the Governor's reversal. Without this basis for the reversal, the only factor supporting the Governor's decision is the gravity of the [15-]year[-]old commitment offense which is no longer probative of a current threat to society.

"Because there is no evidence to support the Governor's conclusion that petitioner remains an unreasonable risk of danger to society," the trial court

granted McDonald's petition and ordered his release in accordance with the parole date calculated by the Board. McDonald was paroled on November 16, 2009.

The People appeal.

## DISCUSSION

According to the People, the trial court's construction of Penal Code section 5011 and California Code of Regulations, title 15, section 2236, violates the rules of statutory construction by leading to absurd results and thwarting the intent of the Legislature. This is so, the People argue, because "prisoners, like McDonald, who deny any involvement in their crime whatsoever, can receive the windfall of release. By contrast, prisoners who admit at least partial responsibility will remain incarcerated because the Board or Governor may nevertheless find that such prisoners have failed to gain insight." Because the People mischaracterize the trial court's ruling as well as the proper application of Penal Code section 5011 and title 15, section 2236 of the California Code of Regulations in the context of the individualized inquiry required under California law, we disagree.

### *Statutory Framework Governing Parole Suitability Determinations*

■ Pursuant to Penal Code section 3041, subdivision (b), the Board "must set a release date at a parole suitability hearing unless it determines that 'consideration of the public safety requires a more lengthy period of incarceration for this individual.' . . . Generally, ' "parole applicants in this state have an expectation that they will be granted parole unless the Board finds, in the exercise of its discretion, that they are unsuitable for parole in light of the circumstances specified by statute and by regulation." ' [Citation.]" (*In re Gaul* (2009) 170 Cal.App.4th 20, 31 [87 Cal.Rptr.3d 736], citation omitted (*Gaul*), quoting *In re Lawrence, supra,* 44 Cal.4th at p. 1204 (*Lawrence*), disapproved on other grounds in *In re Prather* (2010) 50 Cal.4th 238 [112 Cal.Rptr.3d 291, 234 P.3d 541].)

■ "Under the Board's regulations it may properly deny parole to a life prisoner, regardless of the length of time served, 'if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison.' (Cal. Code Regs., tit. 15, § 2402, subd. (a).) In making its decision the Board is directed to consider '[a]ll relevant, reliable information' available to it, including 'the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and

after the crime; past and present attitude toward the crime; . . . and any other information which bears on the prisoner's suitability for release.' (Cal. Code Regs., tit. 15, § 2402, subd. (b).)" (*Gaul, supra,* 170 Cal.App.4th at p. 31.) The parole regulations also list numerous factors "tending to indicate" whether an inmate is suitable or unsuitable for parole.[2] (Cal. Code Regs., tit. 15, § 2402, subds. (c), (d).) These suitability factors are only intended to provide "general guidelines . . . [and] the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel." (*Ibid.*) "In sum, the Penal Code and corresponding regulations establish that the fundamental consideration in parole decisions is public safety." (*Lawrence, supra,* 44 Cal.4th at p. 1205.)

■ Thus, the "core determination" involves "an assessment of an inmate's *current* dangerousness." (*Lawrence, supra,* 44 Cal.4th at p. 1205, original italics.) The Board and Governor are authorized "to identify and weigh only the factors relevant to predicting 'whether the inmate will be able to live in society without committing additional antisocial acts.' " (*Id.* at pp. 1205–1206, quoting *In re Rosenkrantz* (2002) 29 Cal.4th 616, 655 [128 Cal.Rptr.2d 104, 59 P.3d 174] (*Rosenkrantz*).) "[I]n directing the Board to consider the statutory factors relevant to suitability, many of which relate to postconviction conduct and rehabilitation, the Legislature explicitly recognized that the inmate's threat to public safety could be minimized over time by changes in attitude, acceptance of responsibility, and a commitment to living within the strictures of the law." (*Lawrence, supra,* 44 Cal.4th at p. 1219.)

Consequently, the "statutory and regulatory mandate to normally grant parole to life prisoners who have committed murder means that, particularly after these prisoners have served their suggested base terms, the underlying circumstances of the commitment offense alone rarely will provide a valid basis for denying parole when there is strong evidence of rehabilitation and no other evidence of current dangerousness." (*Lawrence, supra,* 44 Cal.4th at

---

[2] The regulations state that circumstances "tending to indicate" unsuitability for parole include (1) the commitment offense was carried out in an "especially heinous, atrocious or cruel manner"; (2) a "[p]revious [r]ecord of [v]iolence"; (3) "a history of unstable or tumultuous relationships with others"; (4) "[s]adistic [s]exual [o]ffenses"; (5) "a lengthy history of severe mental problems related to the offense"; and (6) "[t]he prisoner has engaged in serious misconduct in prison or jail." (Cal. Code Regs., tit. 15, § 2281, subd. (c).)

Factors tending to show that an inmate is suitable for parole include (1) the absence of a juvenile record; (2) "reasonably stable relationships with others"; (3) signs of remorse; (4) a crime committed "as the result of significant stress in [the prisoner's] life"; (5) battered woman syndrome; (6) the lack of "any significant history of violent crime"; (7) "[t]he prisoner's present age reduces the probability of recidivism"; (8) "[t]he prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release"; and (9) the inmate's "[i]nstitutional activities indicate an enhanced ability to function within the law upon release." (Cal. Code Regs., tit. 15, § 2281, subd. (d).)

p. 1211.) The Board (and the Governor) may, of course, rely on the aggravated circumstances of the commitment offense (among other factors) as a reason for finding an inmate unsuitable for parole; however, "the aggravated nature of the crime does not in and of itself provide some evidence of *current* dangerousness to the public unless the record also establishes that something in the prisoner's pre- or postincarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain probative of the statutory determination of a continuing threat to public safety." (*Id.* at p. 1214, original italics.)

"The Governor may only affirm, modify, or reverse the decision of the parole authority on the basis of the same factors which the parole authority is required to consider." (Cal. Const., art. V, § 8, subd. (b).) "[T]he Governor undertakes an independent, de novo review of the inmate's suitability for parole [citation]." (*Lawrence, supra,* 44 Cal.4th at p. 1204.) The Governor "must consider all relevant statutory factors, including those that relate to postconviction conduct and rehabilitation. [Citation.]" (*Id.* at p. 1219.) "Resolution of any conflicts in the evidence and the weight to be given the evidence are matters within the authority of the Governor. As with the discretion exercised by the Board in making its decision, the precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of the Governor, but the decision must reflect an individualized consideration of the specified criteria and cannot be arbitrary or capricious." (*Rosenkrantz, supra,* 29 Cal.4th at p. 677.)

*Standard of Review*

In reviewing the Governor's decision to reverse the Board's determination that an inmate is suitable for parole, the standard of review is "whether 'some evidence' supports the conclusion that the inmate is unsuitable for parole because he or she currently is dangerous." (*Lawrence, supra,* 44 Cal.4th at p. 1191.) "[W]hen a court reviews a decision of the Board or the Governor, the relevant inquiry is whether some evidence supports the *decision* of the Board or the Governor that the inmate constitutes a current threat to public safety, and not merely whether some evidence confirms the existence of certain factual findings. [Citations.]" (*Id.* at p. 1212, original italics.) The reviewing court must uphold the decision denying parole if " 'some evidence' in the record supports the conclusion that petitioner poses an unreasonable public safety risk . . . ." (*In re Shaputis, supra,* 44 Cal.4th at p. 1255 (*Shaputis*).)

Every inmate "is entitled to a constitutionally adequate and meaningful review of a parole decision, because an inmate's due process right 'cannot

exist in any practical sense without a remedy against its abrogation.' " (*Lawrence, supra,* 44 Cal.4th at p. 1205, quoting *Rosenkrantz, supra,* 29 Cal.4th at p. 664.) "[I]n light of the constitutional liberty interest at stake, judicial review must be sufficiently robust to reveal and remedy any evident deprivation of constitutional rights." (*Lawrence,* at p. 1211.)

■ "[T]he determination whether an inmate poses a current danger is not dependent upon whether his or her commitment offense is more or less egregious than other, similar crimes. [Citation.] Nor is it dependent solely upon whether the circumstances of the offense exhibit viciousness above the minimum elements required for conviction of that offense. Rather, the relevant inquiry is whether the circumstances of the commitment offense, when considered in light of other facts in the record, are such that they continue to be predictive of current dangerousness many years after commission of the offense. This inquiry is, by necessity and by statutory mandate, an individualized one, and cannot be undertaken simply by examining the circumstances of the crime in isolation, without consideration of the passage of time or the attendant changes in the inmate's psychological or mental attitude. [Citations.]" (*Lawrence, supra,* 44 Cal.4th at p. 1221.)

■ "In sum, the Board or the Governor may base a denial-of-parole decision upon the circumstances of the offense, or upon other immutable facts such as an inmate's criminal history, but some evidence will support such reliance *only* if those facts support the ultimate conclusion that an inmate *continues* to pose an unreasonable risk to public safety. [Citation.] Accordingly, the relevant inquiry for a reviewing court is not merely whether an inmate's crime was especially callous, or shockingly vicious or lethal, but whether the identified facts are *probative* to the central issue of *current* dangerousness when considered in light of the full record before the Board or the Governor." (*Lawrence, supra,* 44 Cal.4th at p. 1221, original italics.)

"This standard is unquestionably deferential, but certainly is not toothless, and 'due consideration' of the specified factors requires more than rote recitation of the relevant factors with no reasoning establishing a rational nexus between those factors and the necessary basis for the ultimate decision—the determination of current dangerousness." (*Lawrence, supra,* 44 Cal.4th at p. 1210.)

■ Where "all of the information in a postconviction record supports the determination that the inmate is rehabilitated and no longer poses a danger to public safety, and the Governor has neither disputed the petitioner's rehabilitative gains nor, importantly, related the commitment offense to current circumstances or suggested that any further rehabilitation might change the ultimate decision that petitioner remains a danger, mere recitation of the

circumstances of the commitment offense, absent articulation of a rational nexus between those facts and current dangerousness, fails to provide the required 'modicum of evidence' of unsuitability." (*Lawrence, supra,* 44 Cal.4th at p. 1227.)

*There Is No Evidence McDonald Currently Poses an Unreasonable Risk to Public Safety.*

The Governor's reversal in this matter was based on two factors. The first, the circumstances of the commitment offense, does not, standing alone, provide some evidence of current dangerousness. (*Lawrence, supra,* 44 Cal.4th at p. 1214.) The second, lack of insight into the nature and magnitude of the offense, is, without question, a proper factor for the Governor's consideration in determining whether the inmate poses a current threat to public safety. (*Shaputis, supra,* 44 Cal.4th at pp. 1260–1261.) However, the conclusion that there is a lack of insight is not some evidence of current dangerousness unless it is based on evidence in the record before the Governor, evidence on which he is legally entitled to rely. That evidence is lacking here, as the Governor cannot rely on the fact that the inmate insists on his innocence; the express provisions of Penal Code section 5011 and section 2236 of title 15 of the California Code of Regulations prohibit requiring an admission of guilt as a condition for release on parole.

The Governor's finding in this case is phrased in terms of McDonald's denial of involvement in the crime; he suggests no other basis on which to find a lack of insight. Were this sufficient, however, it would permit the Governor to accomplish by indirection that which the Legislature has prohibited. Had his statement of reasons indicated that the Governor believed the inmate would pose a threat to public safety so long as the inmate continued to assert that he had not participated in the crime, reversal would be certain. The use of more indirect language, yielding the same result, cannot compel a different conclusion.

*Remand to the Governor Is Not the Proper Remedy.*

The People, relying on *In re Prather, supra,* 50 Cal.4th 238 [112 Cal.Rptr.3d 291, 234 P.3d 541] (*Prather*), assert that a reversal of the Governor's conclusion requires remand for further consideration by the Governor. We do not agree. *Prather* addressed a reversal of the Board's denial of parole, an issue that had not been resolved by *Lawrence,* which addressed a Governor's reversal. In *Lawrence,* the court had ordered the inmate's immediate release, without return to the Governor for further consideration. The Supreme Court affirmed.

In *Prather,* in contrast, the court indicated that it was confronting the issue not resolved in *Lawrence.* (*Prather, supra,* 50 Cal.4th at pp. 251–252.) The

court required a return to the Board to conduct a new parole-suitability hearing at which the Board could consider any additional evidence in the record that might support a conclusion of current dangerousness. The court concluded that limiting the Board's review only to new evidence since its last hearing would "preclude[] the Board's consideration of the full record and thereby ensure[] that the new evidence will be 'evaluated in a vacuum.' " (*Id.* at p. 255.) Indeed, new evidence "might be probative when considered in light of other, existing evidence in the record." (*Id.* at p. 256.) There might be "circumstances in which the evaluation of newly available evidence requires a reevaluation of existing evidence. Without question, consideration of the interrelationship and possible probative value of both new and existing evidence in the record lies squarely within the discretionary authority vested in the Board." (*Ibid.*)

The limitation that had been imposed on the Board's review in *Prather*, and in earlier cases, infringed the authority of the executive branch to make the necessary parole determinations; the court held this was a violation of the separation of powers established by the Constitution (Cal. Const., art. III, § 3). (*Prather, supra*, 50 Cal.4th at p. 253.) Here, in contrast, we reinstate an earlier executive branch decision—made by the Board—overturning only the "veto" of that decision by the Governor. (See *id.* at p. 251.) The power of the executive branch is, in this instance, not infringed, but respected.

██ Unlike the Board, which has the obligation and ability to take evidence, consistent with due process protections, the Governor cannot create an evidentiary record. A return to the Governor for reconsideration would therefore mean that the Governor could look again only at the record before him on initial consideration, the same record this court has reviewed. We have reviewed that record, and neither the Governor, nor the Board, has the authority to " 'disregard a judicial determination regarding the sufficiency of the evidence [of current dangerousness] and to simply repeat the same decision on the same record.' " (*Prather, supra*, 50 Cal.4th at p. 258, quoting *In re Masoner* (2009) 172 Cal.App.4th 1098, 1110 [91 Cal.Rptr.3d 689].)

██ The People argue that the Governor is now properly permitted to review the same record to determine if there are other facts that demonstrate current dangerousness. However, that assumes circumstances not provided for in the provisions governing the Governor's actions. The Constitution provides for a single review by the Governor of a determination by the Board, and does not authorize repeated reviews of that single determination.[3] As Justice

---

[3] "Article V, section 8, subdivision (b) of the California Constitution provides in full: 'No decision of the parole authority of this state with respect to the granting, denial, revocation, or suspension of parole of a person sentenced to an indeterminate term upon conviction of murder shall become effective for a period of 30 days, during which the Governor may review the

Moreno notes in his concurring opinion in *Prather, supra*, 50 Cal.4th 238, even the Board, with the benefit of the authority to hold a hearing and gather evidence, is obligated to state all of the reasons for its actions rather than withholding some in the event of a reversal "in light of the injunction in *In re Sturm* (1974) 11 Cal.3d 258, 272 [113 Cal.Rptr. 361, 521 P.2d 97] (*Sturm*), that due process requires the Board to provide a 'definitive written statement of its reasons for denying parole.' This requirement followed from the principle that a prisoner has the right to be ' "duly considered" ' for parole and not to be denied parole arbitrarily, and that such rights 'cannot exist in any practical sense unless there also exists a remedy against their abrogation.' (*Id.* at p. 268.) A definitive written statement of reasons was necessary to guarantee that such an effective remedy exists, because, inter alia, it will help to ensure 'an adequate basis for judicial review.' (*Id.* at p. 272.) It is important that *Sturm* be taken at its words, and that the Board be required to issue a *definitive* written statement of reasons. The Board cannot, after having its parole denial decision reversed, continue to deny parole based on matters that could have been but were not raised in the original hearing. Such piecemeal litigation would undermine the prisoner's right to a fair hearing and the ability of courts to judicially review and grant effective remedies for the wrongful denial of parole." (*Prather, supra*, 50 Cal.4th at pp. 260–261 (conc. opn. of Moreno, J.).)

Given that structure, the Governor should state all of the reasons for his determination in the first instance, permitting prompt review, compliance with constitutional mandates, and a predictable process.[4] Remand to the Governor after his determination is found lacking in some evidence of current dangerousness is inconsistent with this requirement and is not required by *Prather*. Accordingly, we affirm the grant of the petition for writ of habeas corpus.

decision subject to procedures provided by statute. The Governor may only affirm, modify, or reverse the decision of the parole authority on the basis of the same factors which the parole authority is required to consider. The Governor shall report to the Legislature each parole decision affirmed, modified, or reversed, stating the pertinent facts and reasons for the action.'

"The statutory procedures governing the Governor's review of a parole decision are set forth in [Penal Code] section 3041.2, which states: '(a) During the 30 days following the granting, denial, revocation, or suspension by a parole authority of the parole of a person sentenced to an indeterminate prison term based upon a conviction of murder, the Governor, when reviewing the authority's decision pursuant to subdivision (b) of Section 8 of Article V of the Constitution, shall review materials provided by the parole authority. [¶] (b) If the Governor decides to reverse or modify a parole decision of a parole authority pursuant to subdivision (b) of Section 8 of Article V of the Constitution, he or she shall send a written statement to the inmate specifying the reasons for his or her decision.' " (*Prather, supra*, 50 Cal.4th at p. 250, fn. 10.)

[4] Because McDonald has been released on parole, we need not reach the issue of the proper mechanism to permit the Board to consider additional evidence indicating a threat to public safety prior to release where a Governor's reversal is overturned, but the inmate has not yet been paroled. If there is evidence that McDonald has violated the conditions of his parole, the mechanism of parole revocation is available. (Pen. Code, § 3060 et seq.)

## *DISPOSITION*

The trial court's grant of McDonald's petition for writ of habeas corpus is affirmed. The Governor's January 6, 2009 decision reversing the Board's August 14, 2008 decision granting McDonald parole is vacated and the Board's parole release order is reinstated. McDonald shall remain released from custody on parole under the terms and conditions prescribed by the Board.

Perluss, P. J., and Zelon, J., concurred.