[No. B228409. Second Dist., Div. Three. Mar. 30, 2011.]

In re KEVIN JACKSON on Habeas Corpus.

COUNSEL

Nancy L. Tetreault for Petitioner Kevin Jackson.

Edmund G. Brown, Jr., Attorney General, Julie L. Garland, Assistant Attorney General, Jessica N. Blonien, Amanda J. Murray and Charles Chung, Deputy Attorneys General, for Respondent The People.

OPINION

**KITCHING, J.—**

## INTRODUCTION

The Board of Parole Hearings (Board) denied petitioner Kevin Jackson parole on December 3, 2008. Jackson challenged that decision by filing a petition for writ of habeas corpus in the California Supreme Court. In response to the petition, the high court ordered respondent, the Secretary of the Department of Corrections and Rehabilitation, to show cause before this court "why the Board of Parole Hearings' decision to deny petitioner parole on December 3, 2008 did not violate Penal Code section 5011, subdivision (b), and California Code of Regulations, title 15, section 2236, by relying, either directly or indirectly, on petitioner's refusal to admit guilt as a

factor demonstrating unsuitability for parole."[1] This court subsequently ordered respondent to show cause why Jackson's petition should not be granted.

Having reviewed the petition, return and traverse, we hold that (1) the Board erroneously denied Jackson parole because there was no evidence that he constituted a current risk to public safety; and (2) the Board's decision to deny Jackson parole on December 3, 2008, violated section 5011, subdivision (b), and California Code of Regulations, title 15, section 2236. We thus grant the petition and remand the matter to the Board for further proceedings consistent with this opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *The Commitment Offense*

In 1983, Jackson was tried for the murder of his former girlfriend Sharon Wade. The prosecution alleged that in the early morning hours of July 5, 1981, Jackson fired two shots at Wade, killing her. Jackson has consistently denied that he shot and killed Wade. He contends that the murder was likely committed by Wilbert, a man Wade was seeing at the time of her murder.

The prosecution's case was premised primarily on circumstantial evidence. There were numerous witnesses who testified regarding Jackson's relationship with Wade and his conduct immediately before the murder. The testimony established that Wade was killed shortly after the acrimonious dissolution of a lengthy relationship between Jackson and Wade. Jackson was furious with Wade because she was seeing another man. Just hours before the shooting, in the late evening of July 4, 1981, Jackson was involved in an angry confrontation with Wade. During that confrontation, Jackson threatened to kill Wade and shoved Wade in the face.

The only eyewitness to the actual shooting was Frederick Demus. Demus testified as follows. In the early morning hours of July 5, 1981, he saw from 75 yards away two vehicles parked near each other. From the vehicles he heard a male and a female yelling and screaming. The male stated: "I should have killed you earlier. Call yourself being a player, I'm tired of that shit." The male then walked to the driver's side of the female's vehicle, fired two shots, got back in his vehicle, and drove away.

Because Demus was so far away and it was night time, he could only testify to the profile of the man who fired the shots. He testified that

---

[1] All future statutory references are to the Penal Code.

Jackson's profile was the same in four respects. Those four respects were the shape of the mouth, forehead, nose and particularly the bottom lip. There were some inconsistencies in Demus's testimony. For example, at trial Demus testified for the first time that he heard the female refer to the male as "Kevin." When Demus was first interviewed by detectives, however, he did not recall the fact that the name Kevin was used.

Additionally, the prosecution's case consisted of impeaching Jackson's statements to a police officer shortly after the murder. When asked whether his problems with Wade were "in the past or last night," Jackson claimed that the problems were "in the past." Jackson also denied ever threatening to kill Wade but he did admit that he had threatened to kill "a guy named Wilbert if she [Wade] didn't stop seeing him." Jackson's testimony about his problems with Wade being "in the past" and not threatening to kill Wade was contradicted by the testimony of prosecution witnesses.

After a bench trial, Jackson was convicted of second degree murder in violation of section 187. The trial court also found that Jackson used a firearm within the meaning of section 1203.06, subdivision (a) and section 12022.5. Jackson was sentenced to 17 years to life in state prison.

### 2. The December 3, 2008, Parole Hearing

On December 3, 2008, the Board held the eighth parole hearing for Jackson. At the hearing the Board and Jackson presented evidence regarding Jackson's preincarceration social, work, and criminal history, Jackson's conduct in prison, Jackson's age and physical and mental health, Jackson's plans if he is released from prison, and other circumstances relevant to Jackson's suitability or unsuitability for parole. As we shall discuss *post*, this evidence indicated that Jackson was suitable for parole.

At the beginning of the hearing, Jackson's counsel stated Jackson did not wish to discuss the crime. The Board, however, reviewed a written psychological evaluation prepared by Dr. Carol Fetterman, dated August 19, 2008, which set forth statements by Jackson regarding his responsibility for Wade's murder. In essence, Jackson stated to Dr. Fetterman that after he was unfaithful to Wade, Wade sought relationships with other men, including Wilbert. Jackson then became jealous of Wilbert and threatened to kill him. According to Jackson, he was responsible for Wade's death because he contributed to the circumstances that led to her death.[2]

---

[2] Dr. Fetterman's report stated: "The inmate stated that he thinks about the victim 'All the time.' When asked what he would tell the victim if he had the opportunity, he replied, 'I blame myself even though I have maintained my innocence. I could have taken a deal. I have learned I played a role by being in a relationship that wasn't healthy. If I had been wiser and more

At the parole hearing, Jackson was asked to explain his statements to Dr. Fetterman. Jackson stated: "I brought infidelity into our relationship . . . I was the one that decided that I wanted to see other people first when she was being faithful. So, then, when the table turned, she decided she wanted to see somebody else. Had I not been unfaithful to her, then she probably wouldn't have decided that she could get even or that she wanted to see other people, and that brought the other person involved in our relationship, and at that point, that's when I said I didn't have the maturity to understand that that's unhealthy, that I shouldn't have—if you're going to be with somebody, be with them. If not, then you should terminate the relationship if you want to play around and see other people."

Later, Presiding Commissioner Sandra Bryson and Jackson had the following dialogue:

Bryson: ". . . I don't understand why you've taken responsibility for her death if you didn't kill her."

Jackson: "Because I think I made the situation worse by threatening the other individual, by even bringing it up—bringing up the point that I was willing to kill him, to shoot him. I didn't know—I didn't know him really that well. I didn't know how he would react to something like that, so that was a—"

Bryson: "You're sitting in here, according to your claim, taking a murder rap for somebody, and you're not angry about that?"

Jackson: "I was angry about it for a long time. [¶] . . . [¶] . . . I couldn't just be consumed with bitterness and guilt. That would eat you alive."

---

mature maybe none of this would have happened. I feel responsibility. I am very sorry.' The inmate said that over the years he has blamed himself for the crime. He does not believe that his sentence was fair but said 'I take responsibility because I put all of us in the situation. I didn't have the maturity to walk away from infidelity.' "

Dr. Fetterman's report further stated: "When discussing the contributing factors to the crime the inmate stated 'My jealousy and the fact that I made threats to the other person (the other man in the triangle). He was angry at her and our relationship was tumultuous. I had broken up with her to see other people because since I had come back from the Air Force I hadn't had a lot of girlfriends and I wanted to live that lifestyle. I cared about her (the fiancé) so I told her that I had become involved with someone else. I did want her back because she had been with someone else. It was my immaturity and feeling that I was too young to be tied down. I decided to quit fooling around and focus on her. Then she wanted to explore her options and see other people. I was hurt and realized I had done the same thing. I was jealous and threatened him (the other guy).' [¶] . . . [¶]

"The inmate denied committing the crime, and claimed that the other man in the 'triangle' killed his fiancé. However, he said that he takes responsibility for her death because he was involved in an unhealthy relationship where there was infidelity, and that made it possible for a second man to be involved. That man, then became jealous of the inmate, and consequently killed the woman."

At the conclusion of the hearing, the Board announced that Jackson was not yet suitable for parole "and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison." As part of its explanation of its ruling to Jackson, the Board stated: "You've taken responsibility for being jealous, but it's impossible for this panel to assess your insight into this crime because you deny committing the crime. Now, you have the right not to discuss this crime with the panel. You exercised that right today. You also have the right not to admit the crime, but you're actively denying the crime, and the panel does not have to believe your denial of committing this crime nor your explanation of taking responsibility. The panel finds, indeed, that you have not taken responsibility for this commitment offense." The Board further stated to Jackson: "You've shown a lot of regret for being incarcerated. You showed precious little remorse for the death of Ms. Wade, whom you said you cared so much about."

### 3. Jackson's Petitions for Writ of Habeas Corpus and the Orders to Show Cause by the California Supreme Court and This Court

Jackson has filed three petitions for writ of habeas corpus challenging the Board's December 3, 2008, decision to deny him parole. On March 19, 2009, Jackson filed a petition for writ of habeas corpus in the superior court. That petition was denied on May 14, 2009.

On June 30, 2009, Jackson filed a petition for writ of habeas corpus in this court. That petition was denied on July 15, 2009.

On August 21, 2009, Jackson filed a petition for writ of habeas corpus in the California Supreme Court. On October 28, 2010, the high court issued an order requiring respondent to show cause before this court "why the Board of Parole Hearings' decision to deny petitioner parole on December 3, 2008 did not violate Penal Code section 5011, subdivision (b), and California Code of Regulations, title 15, section 2236, by relying, either directly or indirectly, on petitioner's refusal to admit guilt as a factor demonstrating unsuitability for parole."

On November 3, 2010, this court issued an order to respondent to show cause why the relief prayed for in Jackson's petition for writ of habeas corpus dated June 30, 2009, should not be granted. On January 26, 2011, we issued an order modifying the order of November 3, 2010, nunc pro tunc, to clarify that respondent was required to show cause why the August 21, 2009, petition for writ of habeas corpus filed in the California Supreme Court should not be granted.

## ISSUES

The overarching issue raised by Jackson's petition for writ of habeas corpus is whether the Board erroneously denied Jackson parole on December 3, 2008. In order to adjudicate that issue we must decide whether some evidence supports a determination that Jackson poses a current threat to public safety if he is released on parole. We must also directly address the issue raised by the California Supreme Court, namely whether the Board's decision to deny Jackson parole violated section 5011, subdivision (b), and California Code of Regulations, title 15, section 2236, by relying, either directly or indirectly, on Jackson's refusal to admit guilt as a factor demonstrating unsuitability for parole.

## DISCUSSION

1. *The Board Erroneously Denied Jackson Parole Because There Was No Evidence That He Constituted a Current Risk to Public Safety*

■ " 'Pursuant to statute, the Board "shall normally set a parole release date" one year prior to the inmate's minimum eligible parole release date, and shall set the date "in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public . . . ." (Pen. Code, § 3041, subd. (a).)' [Citation.] Release on parole is thus 'the rule, rather than the exception.' [Citation.] A parole release date must be set unless the Board determines that public safety requires a lengthier period of incarceration. [Citations.] Every inmate has a constitutionally protected liberty interest in parole decisions ordered by the Board and reviewed by the Governor. [Citation.]" (*In re Aguilar* (2008) 168 Cal.App.4th 1479, 1486 [86 Cal.Rptr.3d 498] (*Aguilar*).)

■ "In determining suitability for parole, the Board must consider certain factors specified by regulation. Circumstances tending to establish unsuitability for parole are that the inmate (1) committed the offense in an especially heinous, atrocious, or cruel manner; (2) has a previous record of violence; (3) has an unstable social history; (4) has sexually assaulted another individual in a sadistic manner; (5) has a lengthy history of severe mental problems related to the offense; and (6) has engaged in serious misconduct while in prison. (Cal. Code Regs., tit. 15, § 2402, subd. (c); [citation].)" (*Aguilar, supra,* 168 Cal.App.4th at pp. 1486–1487; accord, *In re Lawrence* (2008) 44 Cal.4th 1181, 1202, fn. 7 [82 Cal.Rptr.3d 169, 190 P.3d 535] (*Lawrence*).)

"Circumstances tending to show suitability for parole include that the inmate (1) does not possess a record of violent crime committed while a

juvenile; (2) has a stable social history; (3) has shown signs of remorse; (4) committed the crime as the result of significant stress in his or her life, especially if the stress had built over a long period of time; (5) committed the crime as a result of battered woman syndrome; (6) lacks any significant history of violent crime; (7) is of an age that reduces the probability of recidivism; (8) has made realistic plans for release or has developed marketable skills that can be put to use upon release; and (9) has engaged in institutional activities that suggest an enhanced ability to function within the law upon release. (Cal. Code Regs., tit. 15, § 2402, subd. (d); [citation].)" (*Aguilar, supra,* 168 Cal.App.4th at p. 1487; accord, *In re Rosenkrantz* (2002) 29 Cal.4th 616, 654 [128 Cal.Rptr.2d 104, 59 P.3d 174].)

▪ Although the foregoing factors are specified by the governing regulations, they are only general guidelines; the Board must consider all relevant information. (*Aguilar, supra,* 168 Cal.App.4th at p. 1487; Cal. Code Regs., tit. 15, § 2402, subd. (b).) "[U]nder the statute and the governing regulations, the circumstances of the commitment offense (or any of the other factors related to unsuitability) establish unsuitability if, and only if, those circumstances are probative of the determination that a prisoner remains a danger to the public. It is not the existence or nonexistence of suitability or unsuitability factors that forms the crux of the parole decision; the significant circumstance is how those factors interrelate to support a conclusion of current dangerousness to the public." (*Lawrence, supra,* 44 Cal.4th at p. 1212.) Accordingly, when a court reviews a decision of the Board, the relevant inquiry is whether "some evidence" supports the decision of the Board "that the inmate constitutes a current threat to public safety, and not merely whether some evidence confirms the existence of certain factual findings." (*Ibid.*)

Here, none of the circumstances tending to show unsuitability for parole are present. Respondent does not allege that Jackson committed the murder of Sharon Wade in an especially heinous, atrocious, or cruel manner. Apart from the commitment offense, Jackson has not been convicted of a violent crime. Indeed, the only other conviction on Jackson's record is a conviction for possession of a stolen check. He committed that offense when he was 18 years old, and received three years of probation.[3]

There is nothing in the record indicating that Jackson ever sexually assaulted another individual or that Jackson had a history of substance abuse or mental problems. Further, Jackson did not have an unstable social history prior to his incarceration. Jackson lived with his mother and father until he was 16, when his mother died. At that point Jackson took responsibility for many of the tasks previously performed by his mother, including paying the household bills and cooking.

---

[3] Jackson testified at the parole hearing that the court "dismissed" the felony charges so that he could enroll in the Air Force.

Jackson completed high school at age 17 and then enrolled in the Air Force. He left the Air Force in order to take care of his grandmother. After he was honorably discharged from military service, Jackson attended a technical college and a university, and maintained relatively stable employment in a variety of occupations, mostly in the aircraft industry.

Jackson did not engage in serious misconduct while in prison. He was disciplined by prison authorities several times for nonviolent infractions of prison rules, but he has not been disciplined since 1992.

Many of the circumstances tending to show suitability for parole are present in this case. Jackson had no juvenile criminal record and, as stated, had a relatively stable social history prior to his incarceration. After his incarceration, Jackson married Andrea Valerie and maintained a marital relationship with her for 11 years until prison authorities terminated conjugal visits. Since then Valerie has had relationships with other men. Jackson nevertheless has maintained a friendly relationship with Valerie.

While in prison Jackson has engaged in constructive activity and has improved himself. Jackson earned an associate degree from a community college and was an honor student. Jackson also took anger management and other self-help classes offered by the prison. Jackson received vocational training in optical manufacturing, worked as a metal fabricator, painter, assembler, forklift operator, and porter, and always received good work reports. In addition, in the 4 to 5 years prior to the December 3, 2008, parole hearing, Jackson became involved in Islamic studies. Jackson claims he has become a more spiritual person. The prison chaplain stated in a letter to the Board that Jackson had met the challenges he faced "with dignity and resolve," and that Jackson had become "more respectful of life and aware of mortality."

Further, Jackson has shown signs of remorse. He has stated that he thinks of the victim all the time and that he bears responsibility for her death.

At the time of the parole hearing, Jackson was 52 years old. Unfortunately, he was suffering from a number of health problems. Although he had knee replacement surgery in January 2007, Jackson continued to have knee problems. Jackson also had breathing problems, chronic fatigue, and tumors all over his body.

Despite his health problems, Jackson had realistic plans for release. The Board received numerous letters from Jackson's family and friends stating that they would provide Jackson with employment, a place to live and financial and other support. Dr. Fetterman stated in her psychological evaluation: "It . . . seems that he [Jackson] has two viable choices for residence. It

also appears that he has good support from family and friends in the community." Further, Jackson inherited 140 acres of land in Arkansas. At the time of the parole hearing, this land was being sold for his benefit.

Petitioner Jackson's brother Anthony Jackson, an officer of an education services and products company, stated in a letter to the Board that he would offer petitioner a job once he is released from prison. The Board stated at the parole hearing that Jackson had "viable" parole plans due to a number of factors, including his brother's job offer and his "marketable" job skills.

Because Jackson did not have psychological or substance abuse problems, and in light of Jackson's social and criminal history, prospects for employment if released from prison, and other factors, Dr. Fetterman concluded that Jackson "poses a *low* likelihood to become involved in a violent offense if released into the free community . . . ." Psychological evaluations conducted in 1999, 2001, 2004 and 2007 came to similar conclusions.

Respondent contends Jackson was unsuitable for parole because at the parole hearing he minimized his culpability for his conviction of possession of a stolen check. At the hearing, Jackson stated his involvement in the crime was limited to driving his friend to a bank, and that his friend was the person who actually unlawfully removed a check from a bank machine. We cannot assess whether Jackson minimized his involvement in this crime because there is nothing in the record, except for Jackson's testimony, regarding the facts of the crime. Even assuming Jackson minimized his culpability for this nonviolent offense he committed decades ago as an 18 year old,[4] his testimony at the parole hearing regarding that offense did not constitute some evidence that he currently poses a danger to public safety.

Respondent also contends Jackson was unsuitable for parole due to his failure to attend sufficient self-help programs in prison. Jackson participated in self-help programs in 1991 and 1992, and then in 2004 he took a 12-week anger management class. When asked why there was a long gap between self-help classes, Jackson stated that such classes were unavailable in the locations he was incarcerated. In its explanation of its decision to deny Jackson parole, the Board noted that Dr. Fetterman opined Jackson would benefit from participation in additional self-help programs.

---

[4] Like a commitment offense, an inmate's prior criminal history may lose its probative value at some point in time. "[W]hen there is affirmative evidence, based upon the prisoner's subsequent behavior and current mental state, that the prisoner, if released, would not currently be dangerous, his or her past offense may no longer realistically constitute a reliable or accurate indicator of the prisoner's current dangerousness." (*Lawrence, supra,* 44 Cal.4th at p. 1219.)

Merely because Jackson would benefit from additional self-help programs does not mean that Jackson currently poses a danger to society if he is released from prison. Many people in and out of prison could benefit from self-help programs; that does not mean such people are necessarily likely to commit violent crimes. Jackson's purported failure to attend sufficient self-help programs does not constitute some evidence that he is currently dangerous.

After reviewing all of the relevant circumstances, including the suitability and unsuitability factors specified in the governing regulations, we conclude that there was no evidence that Jackson constituted a current threat to public safety as of December 3, 2008. The Board thus erroneously denied Jackson parole on that date.

> 2. *The Board's Decision to Deny Jackson Parole on December 3, 2008, Violated Section 5011, Subdivision (b), and California Code of Regulations, Title 15, Section 2236*

■ Section 5011, subdivision (b) provides: "The Board of Prison Terms shall not require, when setting parole dates, an admission of guilt to any crime for which an inmate was committed."[5] Respondent argues that "[u]nder the plain-language reading of the statute, the statute only applies when the Board sets a parole release date, not when the Board considers whether an inmate is suitable for parole." We disagree. Only if the inmate is suitable for parole does the Board determine a parole date. The phrase "when setting parole dates" thus encompasses the Board's consideration of whether an inmate is suitable for parole. Accordingly, under section 5011, subdivision (b), "[t]he Board is precluded from conditioning [an inmate's] parole on an admission of guilt." (*In re Palermo* (2009) 171 Cal.App.4th 1096, 1110 [90 Cal.Rptr.3d 101] (*Palermo*), disapproved on other grounds in *In re Prather* (2010) 50 Cal.4th 238, 252 [112 Cal.Rptr.3d 291, 234 P.3d 541] (*Prather*); accord, *In re McDonald* (2010) 189 Cal.App.4th 1008, 1018 [118 Cal.Rptr.3d 145] (*McDonald*).)

The prohibition against requiring an inmate to admit guilt is also found in California Code of Regulations, title 15, section 2236, which provides in part: "The facts of the crime shall be discussed with the prisoner to assist in determining the extent of personal culpability. The board shall not require an admission of guilt to any crime for which the prisoner was committed. A prisoner may refuse to discuss the facts of the crime in which instance a decision shall be made based on the other information available and the refusal shall not be held against the prisoner."

---

[5] As of July 1, 2005, any reference to the "Board of Prison Terms" in the Penal Code refers to the Board of Parole Hearings. (§ 5075, subd. (a).)

Respondent contends that the Board did not deny Jackson parole because of his refusal to admit his guilt. Rather, respondent argues, the Board justifiably denied Jackson parole due to his lack of insight into the crime, his failure to take responsibility for it, and his lack of remorse.

■ In *In re Shaputis* (2008) 44 Cal.4th 1241, 1261 [82 Cal.Rptr.3d 213, 190 P.3d 573] (*Shaputis*), the California Supreme Court held that an inmate's lack of insight into his crime and failure to take responsibility for it may constitute some evidence that he currently poses an unreasonable danger to society. California Code of Regulations, title 15, section 2402, subdivision (d)(3) provides that one of the circumstances tending to show suitability for parole is the following: "Signs of Remorse. The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands the nature and magnitude of the offense." A lack of remorse thus can be considered by a court as a factor tending to show an inmate's unsuitability for parole.

An essential issue raised in this case is whether the Board can use an inmate's failure to admit his guilt as evidence of a lack of insight, a failure to take responsibility, and an absence of remorse. This issue was addressed in *Palermo* and *McDonald*.

In *Palermo*, the petitioner Darin Palermo shot and killed his former girlfriend. At trial, Palermo admitted he accidentally shot the victim and thus was guilty of manslaughter. The jury rejected Palermo's manslaughter claim and convicted him of second degree murder. (*Palermo, supra*, 171 Cal.App.4th at p. 1100.) At his parole hearing, evidence was introduced showing that Palermo still believed a conviction for manslaughter was " 'more appropriate' " because " '[h]e never meant to kill her.' " (*Id.* at p. 1104.) The Board denied Palermo parole due in part to his lack of "insight" into the commitment offense, and encouraged Palermo " 'to continue to work in the area of self-help to continue to build insight.' " (*Id.* at p. 1105.)

The Court of Appeal held that the Board's decision to deny Palermo parole was erroneous. The People argued that "the Board's concerns about [Palermo's] insight were appropriate and were not an indirect requirement he admit he is guilty of second degree murder." (*Palermo, supra*, 171 Cal.App.4th at pp. 1110–1111.) The court rejected that argument. (*Id.* at p. 1111.)

In reaching its decision, the *Palermo* court contrasted its case with other cases in which the inmate maintained his innocence. The court stated: "Here, in contrast to the situations in *Shaputis* and [*In re McClendon* (2003) 113 Cal.App.4th 315 [6 Cal.Rptr.3d 278] (*McClendon*)], [Palermo's] version of

the shooting of the victim was not physically impossible and did not strain credulity such that his denial of an intentional killing was delusional, dishonest, or irrational. And, unlike the defendants in [*In re Van Houten* (2004) 116 Cal.App.4th 339 [10 Cal.Rptr.3d 406]], *Shaputis*, and *McClendon*, [Palermo] accepted 'full responsibility' for his crime and expressed complete remorse; he participated effectively in rehabilitative programs while in prison; and the psychologists who evaluated him opined that he did not represent a risk of danger to the public if released on parole. Under these circumstances, his continuing insistence that the killing was the unintentional result of his foolish conduct (a claim which is not necessarily inconsistent with the evidence) does *not* support the Board's finding that he remains a danger to public safety." (*Palermo, supra*, 171 Cal.App.4th at p. 1112.)

In *McDonald*, the petitioner Michael McDonald was accused of killing a teenager named Alexander Geraldo. McDonald denied doing so, but he was convicted of second degree murder. (*McDonald, supra*, 189 Cal.App.4th at p. 1013.) At his parole hearing, McDonald denied involvement in planning or carrying out Geraldo's murder, and claimed that the Aces of Spades, a secret group of which McDonald was a member, killed Geraldo. (*Id.* at pp. 1016–1017.) McDonald nonetheless said "he felt responsible for Geraldo's death because the Aces of Spades used him [McDonald] to get Geraldo to let his guard down . . . ." (*Id.* at p. 1016.)

The Board found McDonald suitable for parole but the Governor reversed that decision in part because of "McDonald's lack of insight based on his claim of limited responsibility." (*McDonald, supra*, 189 Cal.App.4th at p. 1017.) The Court of Appeal vacated the Governor's decision on the ground that there was no evidence that McDonald posed a current danger to public safety. (*Id.* at pp. 1023, 1026.)

 In reaching this decision, the *McDonald* court stated: "[L]ack of insight into the nature and magnitude of the offense, is, without question, a proper factor for the Governor's consideration in determining whether the inmate poses a current threat to public safety. (*Shaputis, supra*, 44 Cal.4th at pp. 1260–1261.) However, the conclusion that there is a lack of insight is not some evidence of current dangerousness unless it is based on evidence in the record before the Governor, evidence on which he is legally entitled to rely. That evidence is lacking here, as the Governor cannot rely on the fact that the inmate insists on his innocence; the express provisions of Penal Code section 5011 and section 2236 of title 15 of the California Code of Regulations prohibit requiring an admission of guilt as a condition for release on parole.

"The Governor's finding in this case is phrased in terms of McDonald's denial of involvement in the crime; he suggests no other basis on which to

find a lack of insight. Were this sufficient, however, it would permit the Governor to accomplish by indirection that which the Legislature has prohibited. Had his statement of reasons indicated that the Governor believed the inmate would pose a threat to public safety so long as the inmate continued to assert that he had not participated in the crime, reversal would be certain. The use of more indirect language, yielding the same result, cannot compel a different conclusion." (*McDonald, supra*, 189 Cal.App.4th at p. 1023.)

The present case is analogous to *Palermo* and *McDonald*. The Board did not directly state that Jackson was unsuitable for parole due to his refusal to admit he was guilty of the commitment offense—indeed, the Board stressed that Jackson was not required to admit guilt. Instead, the Board denied Jackson parole based on its findings that Jackson lacked insight into the crime, failed to take responsibility for it, and did not have remorse. But the only evidence to support these findings was Jackson's refusal to admit he shot and killed Sharon Wade. This evidence is expressly prohibited by section 5011, subdivision (b) and section 2236 of title 15 of the California Code of Regulations. The Board thus lacked any evidence to support its decision that Jackson was unsuitable for parole.

■ Because the only basis for the Board to conclude Jackson lacked insight, failed to take responsibility, and lacked remorse was his refusal to admit guilt for the commitment offense, the Board indirectly relied on that refusal to deny Jackson parole. By doing so, the Board violated section 5011, subdivision (b) and California Code of Regulations, title 15, section 2236.

It is also important to recognize that like *Palermo* and *McDonald*, this is not a case where the inmate's version of the crime was physically impossible or strained credulity. While there was certainly substantial evidence to support the trial court's finding that Jackson murdered Wade, Jackson's denial of that allegation is not necessarily inconsistent with the evidence. Further, like the inmates in *Palermo* and *McDonald*, Jackson accepted responsibility for the death of his victim, behaved well in prison, successfully engaged in self-improvement activity while there, and received positive reports regarding his potential dangerousness by prison psychologists. Under these circumstances, Jackson's continuing insistence that he did not shoot and kill Wade does not support the Board's finding that he remains a danger to public safety.

## DISPOSITION

The petition for habeas corpus is granted and the Board's decision to deny Jackson parole on December 3, 2008, is vacated. The matter is remanded to the Board to determine whether a new evaluation by the Board of Jackson's

suitability for parole is necessary and whether, in light of this opinion, Jackson should be released. (*Prather, supra*, 50 Cal.4th at p. 258.) The Board may not base an unsuitability determination solely upon evidence already considered and rejected by this court, including but not limited to Jackson's statements in the August 19, 2008, psychological evaluation and at the December 3, 2008, parole hearing regarding his responsibility for the commitment offense. (*Id.* at pp. 257–258.)

Croskey, Acting P. J., and Aldrich, J., concurred.