Filed 9/1/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| In re FRED SWANIGAN | B261904 |
|---|---|
| on Habeas Corpus. | (Los Angeles County Super. Ct. No. A619483) |

ORIGINAL PROCEEDING; petition for a writ of habeas corpus. William C. Ryan, Judge. Petition granted.

Rich Pfeiffer, under appointment by the Court of Appeal, for Petitioner.

Kamala D. Harris, Attorney General, Jennifer A. Neill, Assistant Attorney General, Julie A. Malone and Nikhil Cooper, Deputy Attorneys General for Respondent.

————————————

Fred Swanigan petitions for a writ of habeas corpus to overturn the April 3, 2014 decision of the Board of Parole Hearings (Board) finding him unsuitable for parole. After reviewing the record before us we conclude that no evidence supports the Board's decision. Therefore, we grant the petition.

**BACKGROUND**

1.     *The Commitment Offense*

In 1981, a jury convicted Swanigan, then 20 years old, of first degree murder. The jury found that he personally shot Ronald Como on September 10, 1980. The trial court sentenced him to 27 years to life in prison. At his 2014 hearing, the Board stated that Swanigan's minimum eligible parole date was September 15, 1997. We describe the facts of the crime as stated in the Court of Appeal opinion affirming Swanigan's conviction, because the Parole Board relied on it. We note that Swanigan's counsel did not raise a substantial evidence challenge on appeal, resulting in a mostly conclusory description of the crime facts. Where we rely on the testimony at the 2014 parole hearing, we so state.

We quote the opinion for the facts of the crime:

"Beginning in February or March, 1980, appellant and Ronnie Como began arguing over the damage Como had caused to appellant's car. [Appellant had brought his car to Como's auto body shop for repair and Como backed into the car.] Whenever they met, they would argue and appellant would insist upon payment for damage to the vehicle. Around September 1, 1980, the two again argued angrily. On each occasion, appellant was dressed in jogging clothes.

"On September 10, 1980, at approximately 3 p.m., appellant was seen to walk in the direction of Como's place of business, wearing beige jogging pants with a red bandana about his neck. His left hand was inserted in the waistband of his pants. He disappeared from view as he walked up the street and shortly thereafter a shot was heard. Appellant was then seen running in the opposite direction, carrying a gun, with the red bandana pulled over his face.

2

"Another witness observed a man resembling appellant, in jogging pants and a red bandana, approach Como and engage him in conversation on the street near Como's business. As Como started to walk away, the man shot him once, killing him, then fled with the bandana pulled over his face. Two children, ages 7 and 9, who lived nearby also identified appellant as the man they had seen run past them carrying a gun around the time of the killing.

"Another witness, Terry Brown, also saw the gunman run from the scene and he looked familiar to him. After seeing appellant in the neighborhood several times, Brown realized he was the gunman he had seen flee the area of the killing. On October 9, 1980, Brown was shown a display of six photographs from which he selected one of appellant. He commented that there were certain dissimilarities in the photograph and was then shown a single color photograph of appellant of more recent vintage. He again identified appellant as the gunman."

Swanigan was arrested on October 31, 1980. "He was placed in custody . . . and the investigating officer proceeded with the investigation, executing search warrants for appellant's home and automobile." Swanigan's car and house were searched but no weapons, scarves, or beige jogging pants, or bandana were apparently found. "[O]n Monday, November 3, 1980, appellant agreed to speak with [Detective] Soisson and denied owning a gun or beige jogging pants, stating he was with Darlene Cole at the time of the slaying. . . . At trial, both appellant and Ms. Cole testified in conformity with appellant's statement to Soisson." At the parole hearing, Swanigan admitted that around the time of the events he owned a gun that he carried for protection from gang members.

Except for an admission made at his eleventh parole hearing in 2014 and quickly withdrawn, Swanigan has continuously and consistently maintained that he did not shoot Como.

3

2.    *Swanigan's Preprison History*

Swanigan was born on October 9, 1959 in Los Angeles, California. He was raised primarily by his mother and had an older brother and younger half-sister. Swanigan was in contact with, but not close to, his father, who was incarcerated at least once.

Swanigan attended school in the Los Angeles public school system and graduated from Manual Arts High School in 1977. He was a B student and attended school regularly, playing basketball on the high school basketball team. He was trained at the Watts Skills Center as a machinist from 1977 to 1978. Until his incarceration for killing Como, he lived at home with his mother. Swanigan has no juvenile criminal record. As an adult, Swanigan was arrested twice, but in each case charges were dismissed. In 2012, Swanigan told the evaluating psychologist, Board Forensic Assessment Division Forensic Psychologist Michael Pritchard, Ph.D., that he pleaded guilty to stealing jewelry from a store. This charge is not noted in Swanigan's criminal history report and was known to the Board and to Dr. Pritchard only because Swanigan voluntarily disclosed it. Swanigan has no other criminal record. He has never participated in gangs or gang activity, nor had a drug or alcohol problem. As one of the commissioners described his history, "normally when you look at a guy, there's usually a pretty big history of them acting in a criminal manner, right? You don't have that history."

Swanigan is now 55 years old. He is married and has a 37-year-old daughter and a 23-year-old stepson.

3.    *In-prison Conduct*

At the time of the 2014 hearing, Swanigan had been imprisoned for 33 years and had been discipline-free for the prior 18 years. He had no incidents even suggesting aggression for the last 21 years. Prior to 1996, Swanigan had fourteen "115" disciplinary actions, which were described by a prior Board as "certainly not anything involving violence."[1] His last 115, in 1996, was issued for being out of bounds.[2] Swanigan had

---

[1]    A "115" is a rules violation report issued when "misconduct is believed to be a violation of law or is not minor in nature." (Cal. Code Regs., tit. 15, § 3312, subd. (a)(3).)

4

four "128A's," the last one in 1994.[3]  Although he was assaulted by another inmate in 2009, Swanigan maintained his composure and deferred to the correctional officers.

While in prison, Swanigan participated in numerous self-help courses, therapy programs, training classes, and community service activities.   He engaged in victim awareness programs, anger management programs and courses, alternatives to violence programs and seminars covering such topics as self-discipline, empathy, self-examination, anger, and communication.  He has been commended for participation as a volunteer in support of a children's health program, and has completed religious and self-development programs.

Swanigan was assigned to a vocational education program in graphic arts for six years.  His "work evaluations were generally at the exceptional level and he was certified in this skill and was employed as a teacher of other students."  Since 2009, he has worked in the prison laundry as a sorter, and "receives above average evaluations and is described as 'an exceptional worker.'"

4.      *Parole Plans*

Upon release to parole, Swanigan intends to enter the Planned Reentry Program transitional living facility in Los Angeles or a similar transitional facility.  He plans to seek employment and training through the We Build Program organized by the Los Angeles school system.  As a backup, he has arranged housing with his cousin.

---

[2]      The 115's were issued for refusing to work, disruptive conduct, masturbating, fighting, behavior likely to lead to violence, possession of contraband, refusing a body search, out of bounds, refusing to turn over mattress, disrespect to staff, and possession of marijuana.

[3]      A  "128A" is a "Custodial Counseling Chrono" issued when "minor misconduct recurs after verbal counseling or if documentation of minor misconduct is needed."  (Cal. Code Regs., tit. 15, § 3312, subd. (a)(2).)  Swanigan received 128A's for disruptive conduct, failure to report to work and running in the corridor.

5. *2012 Psychological Evaluation*

In 2012, before Swanigan's tenth parole hearing, Dr. Pritchard interviewed and evaluated Swanigan and prepared a written report. This report was relied upon by both the 2012 and the 2014 Board in evaluating Swanigan for parole.

Dr. Pritchard concluded that Swanigan presented a "Low" risk to the public. Swanigan "obtained a total score on the LS/CMI [Level of Service Case Management Inventory] that was higher than 2% of the normative sample of incarcerated male offenders in the United States; meaning that 2% of inmates evidenced fewer risk factors associated with general recidivism and 98% evidenced more." This classification score "is as low as it can be, given the commitment offense."

On the Psychopathy Checklist-Revised (PCL-R) evaluation, Swanigan obtained a total score that was "higher than 16% of the normative sample . . . meaning that 16% of male offenders evidenced fewer traits of psychopathy and 84% evidenced more." The report concluded that Swanigan "does not demonstrate characteristic high need for stimulation and manipulative and parasitic tendencies. He has no history of early behavior problems or juvenile delinquency. He has not been promiscuous, nor has he engaged in multiple short term relationships. He has not been a particularly criminal individual, nor has he ever failed conditional release. He has realistic future goals." The report describes this PCL-R score as being based on the lifetime of the individual, including the immutable fact of his murder conviction and his past prison disciplinary violations.

Dr. Pritchard opined that Swanigan now "represents a non-elevated risk of violence. He presents with non-significant risk factors and specialized intervention or risk reduction strategies appear unwarranted. He has a limited history of criminal violent behavior. He has not been a substance abuser. He has no mental illness. His behavior for over 15 years has been well controlled, compliant, and goal directed. He has engaged in self-help groups and individual counseling in order to improve his awareness and his ability to redirect his behavior. He has a reasonable parole plan." Dr. Pritchard also

reported that Swanigan presents no evidence of any distinct personality disorder, and that he has no need for participation in mental health services.

As to remorse, Swanigan told Pritchard "I have remorse for the family and his victim. I am sorry it happened. It affected his life and my life and his family's life and my family's life. I have experienced that rippling effect when you lose a loved [one] and my daughters have experienced that and I know that his family experienced that and that we are all suffering." As to insight specifically into the commitment offense, Dr. Pritchard stated, without criticism or questioning Swanigan's sincerity, that Swanigan "can offer no insight into the life crime as he states he did not commit it."

6.      *Parole Hearings*

Swanigan's first parole hearing took place in 1996. At that hearing, as he had done continuously since 1980, Swanigan denied involvement in the commitment offense.

The Board denied parole and recommended that Swanigan participate in self-help programs and comply with prison standards. Swanigan followed the Board's admonitions and regularly participated in self-help courses, therapy programs, training classes, vocational training, and community service activities, and had no further disciplinary incidents. Over the next 18 years, Swanigan continued to deny that he committed the murder and the Board continued to deny parole.

At his eighth hearing in 2009, Swanigan "accepted responsibility" for the life crime, stating "I would like to accept full responsibility for the crime, and I'm not trying to minimize my participation. And I do have remorse for the victim because I can relate as well as I can understand the loss that the person is dealing with, because I've lost my mother and she got killed. I know you can't bring anybody back and it's forever. When you've lost somebody to this degree, you never can bring the victim back, so you understand the loss." The Board was not satisfied and denied parole, citing Swanigan's repeated denials of involvement in the crime, saying "we do note that you do continue to maintain your innocence, and this is despite the jury findings, the judicial review at the time before sentencing, and also the [a]ppellate finding from the appellate court." At the same hearing in 2009, in explaining the rationale for the Board's decision,

7

Presiding Commissioner Garner told Swanigan that with respect to "current attitude toward the crime, . . . other than accepting responsibility in your closing today, there's been an ongoing indication of denial of commission of the offense." Similarly, with respect to remorse, the Board informed Swanigan that "one of the difficulties is it's hard for you to admit remorse other than feeling sorry for the fact that the victim did die. And of course, the difficulty would be associated with the indication that you did not commit the crime." The deputy district attorney argued against parole, citing the appellate opinion affirming Swanigan's conviction, that "the inmate's denials are absurd," that he is "failing in the area of insight" because he "has not internalized and expressed the reasons that caused him to act that way."

In 2012, before his parole hearing that year, Swanigan described to Dr. Pritchard his reaction to what he perceived as the Board's insistence that he admit the murder. "It is not what happened [*his committing the murder*]. I am being coerced. I feel like I have to say it. It has been a nightmare to be accused of a crime I did not commit. Nobody will listen to me. I was almost in tears [*at the Board hearing in 2009*] . . . . I'm not a liar. I have done 31 years. They [*the Board*] just want to hear what they want to hear."

7.    *The 2012 Parole Hearing*

At the 2012 parole hearing Swanigan did not again "accept responsibility" for the crime, and again denied the murder. The Board again denied parole.

Although the Board cited positive factors that tended to show suitability for parole, the Board concluded: "So what we need to do then is consider whether or not there are any other circumstances coupled with the noted immutable circumstances that would lead us to the conclusion that Mr. Swanigan poses a continued threat to public safety, and we find that he does for the following reasons. First of all, we noted that Mr. Swanigan has failed to show adequate signs of remorse and accept full responsibility for his criminal actions. He continues to deny responsibility for the life crime in spite of a record that clearly identified him as the perpetrator with eyewitnesses. His version of the life crime in our estimation is not plausible. . . . More importantly, we note that Mr. Swanigan has failed to not only accept responsibility for his actions, but the concern

8

that we have today is that if you don't take responsibility for your actions, then you're likely to repeat similar kinds of actions in the future, if there is not any recognition of your role in the life crime and further examination of why you committed the crime. *And until you get to that point, we would consider you a continuing risk to public safety*." (Italics added.)

The 2012 Board told Swanigan at least 10 times that his denial of parole centered on his denial of the life crime.[4] Swanigan's next parole hearing was scheduled in three years.[5]

8. *The 2014 Parole Hearing*

In 2014, Swanigan received an advanced parole hearing. The notice granting the advanced hearing date stated that Swanigan's "next suitability hearing will be advanced to offer him an opportunity to discuss his commitment offense and to demonstrate that he has an understanding of the causative factors of the life crime." At the hearing, Swanigan at first admitted the murder but shortly thereafter recanted after a recess during which his attorney told him to tell the truth. He described to the Board the dispute over the car that

---

[4] "Mr. Swanigan has failed to show adequate signs of remorse and accept full responsibility for his criminal actions." "He continues to deny responsibility for the life crime in spite of a record that clearly identified him as the perpetrator with eyewitnesses." "His version of the life crime in our estimation is not plausible." "He can offer no insight into the life crime. As he states, he did not commit it. So that again goes to the issue of remorse that I stated earlier." "You did verbalize some remorse, but you haven't taken any steps to actually alleviate the pain and suffering of the victims." "And perhaps it's because you don't feel a level of responsibility for the crime, so it's hard for you to make that connection from responsibility to remorse to actually taking steps to try and alleviate the pain and suffering of the victims." "You're certainly not required to admit the life crime. The problem comes, in that when your denial is not plausible and when it appears to us that it's an attempt to be dishonest or untruthful with us." "[A]s I say, you don't have to admit anything to us. It's just an interesting observation, and I think that it kind of coincides with what we see, which is a lack of empathy and a lack of remorse. And as long as you can keep saying to yourself I didn't do these things, you don't have to worry about empathy and remorse." "[W]hat scares us is that if you're released, you still have this failure to accept that which you have done and that makes you potentially dangerous. And you don't seem to have this empathy even if you want to profess innocence, you don't seem to have this empathy which is really critical in people in their ability to function in a free society."

[5] Swanigan petitioned for a writ of habeas corpus after the 2012 hearing, which was summarily denied.

he and Como engaged in for six months prior to the shooting. Regarding the events of the crime Swanigan gave little detail, explaining that he walked to Como's place of business on the day of the shooting, shot Como once, and ran away. One of the commissioners asked Swanigan why he had previously denied the murder. Whereupon Swanigan, after a brief recess, recanted and again denied that he shot Como. The Board expressed frustration with Swanigan, after which he explained that "I've been in prison—this is my eleventh hearing and I've been goaded this way. I've been goaded that way. I've been telling the truth from day one, and as I said, it wasn't anyone listening to me. . . . And so I accept responsibility when I came here. It seemed like the hearings get worse and worse and worse and the time just keep passing by and I just—I'm tired."

Swanigan stated at least once during the hearing that he believed he was required to admit the crime. Presiding Commissioner John Peck discussed with Swanigan the evidence that supported his conviction, stating that he was "trying to figure out if his version is plausible or implausible." Commissioner Peck questioned Swanigan about his admission that he committed the crime and then recanting it, saying, "[y]ou told me earlier you did do it. Now you're telling me you didn't do it. You've been in prison for a long time for a crime that you didn't commit. You've been telling the truth. That wasn't working so you decided today to try to tell us something that you thought we wanted to hear so you get an opportunity for a date. Is that correct or is that wrong?" Swanigan responded, referencing the order granting the advanced hearing date, saying, "Well, it says here I have to talk about the case, you know, understand it."

The deputy district attorney, arguing against parole, also would have confirmed Swanigan's impression that he was required to admit the life crime before the Board would grant him parole, saying "[i]f he admitted today, I would have said after 33 1/2 years of lying, I can't say today he got the right answer, go home. All I can say is the sooner he admits, the sooner he can get started on significant, relevant rehabilitation. Until then, I'm asking for a denial now, and if I'm here again, I will ask for a denial another time."

10

Once again the Board denied parole, but now adding the new ground that Swanigan had lied to them when he briefly confessed, basing the denial both on lack of insight into the life crime and lack of credibility.

Although denying parole, Commissioner Peck listed the numerous factors demonstrating suitability for parole, including that Swanigan does "have some positives that I'd like to get on the record. You have been involved in self-help programming, which makes us happy. Haven't had a 115 in a while.[6] Makes us happy. Makes us feel that you're on the right path. You really didn't have a significant history of violent crime while as a juvenile or even as an adult. You're at an age that reduces the probability of recidivism.[7] I don't have any problems with your parole plans."

Deputy Commissioner Patricia Cassady agreed, adding as factors demonstrating suitability that Swanigan's risk classification score was 19, "which is as low as it can be given the commitment offense," and that Swanigan "received a lot of laudatory chronos as far as [his] work performance, excellent work reports." Cassady cited as positives that Swanigan participated in numerous self-help, vocational, anger management and similar programs, and remarked that other programs in which he participated could provide necessary transitional support to Swanigan. As to his parole plans, the commissioner noted that Swanigan had offers of residence and employment and had completed several vocations, including graphic arts, print shop, textiles, and upholstery. She further noted that he has a high school diploma and has completed a number of college credits.

Deputy Commissioner Cassady concluded: "How difficult it is to have an inmate that has programmed, that has stayed disciplinary-free, that has upgraded educationally, that has spent 33 years in prison, how hard it is for us to say no. Because you have programmed and you have upgraded and you have done a lot of time, and that's not easy from this side of the table. You may think it is, but it's not, because we want to be able to commend you for all of those positive things. But then you come in saying and trying to say what you think the Board wants to hear."

---

[6]    At the time, it had been 18 years since Swanigan had a 115.

[7]    Swanigan is currently 55 years old.

11

The Board again informed Swanigan, in denying parole, that it is "hard to have insight into a life crime that you don't think you committed."

9.      *Habeas Corpus Proceedings*

Swanigan filed a petition for writ of habeas corpus in the Los Angeles County Superior Court in June 2014.  In July 2014, that court denied the petition, concluding the record contained some evidence to support the Board's unsuitability determination.

In February 2015, Swanigan filed a habeas petition in this court.  We issued an order to show cause and appointed counsel for Swanigan.  The Attorney General filed a return to the order to show cause, and Swanigan filed a traverse to the return.

**DISCUSSION**

Swanigan contends that the Board's decision to deny parole is not supported by "some evidence" that he poses an unreasonable risk to the public if released.  The Attorney General contends that the seriousness of Swanigan's crime, together with his lack of insight and lack of credibility, are some evidence of his current dangerousness. We agree with Swanigan.[8]

1.      *Governing Law*

Beginning with *In re Rosenkrantz* (2002) 29 Cal.4th 616, and, most recently in *In re Shaputis* (2011) 53 Cal.4th 192 (*Shaputis II*), the Supreme Court has explained both the standard the Board must apply in making parole decisions and the standard of review we must apply in reviewing the Board's decisions.

The Board is the administrative agency authorized to grant parole and set release dates.  (Pen. Code, §§ 3040, 5075 et seq.)[9]  As pertinent here, "the Board 'shall normally set a parole release date' one year prior to the inmate's minimum eligible parole release date, and shall set the date 'in a manner that will provide uniform terms for offenses

---

[8]      As a result of our holding, we do not address the additional contentions in Swanigan's petition.

[9]      Unless otherwise indicated, all further unspecified statutory references are to the Penal Code, and all further undesignated references to regulations are to title 15 of the California Code of Regulations.

12

of similar gravity and magnitude [*with*] *respect to their threat to the public . . . .*'
(§ 3041, subd. (a), italics added.) . . . [A] release date must be set 'unless [the Board] determines that . . . *public safety* requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting.'" (*In re Lawrence* (2008) 44 Cal.4th 1181, 1201-1202, fn. omitted (*Lawrence*).)

When assessing whether a life prisoner poses an unreasonable risk of danger to society if released from prison, the Board must consider all relevant, reliable information available on a case-by-case basis. The regulations provide a nonexclusive list of circumstances tending to show suitability or unsuitability for release. (Tit. 15, § 2402, subds. (c) & (d).) Factors tending to indicate suitability include: (1) the absence of a juvenile record; (2) a stable social history; (3) signs of remorse; (4) the motivation for the crime was significant life stress; (5) battered woman syndrome; (6) no significant history of violent crime; (7) the inmate's age; (8) realistic plans for the future; and (9) institutional behavior. (*Ibid.*) Circumstances tending to show unsuitability include: (1) the commitment offense was committed "in an especially heinous, atrocious or cruel manner"; (2) a previous record of violence; (3) an unstable social history; (4) sadistic sexual offenses; (5) psychological factors; and (6) serious misconduct while incarcerated. (*Ibid.*) "In sum, the Penal Code and corresponding regulations establish that the fundamental consideration in parole decisions is public safety . . . ." (*Lawrence*, *supra*, 44 Cal.4th at p. 1205.) The "core determination" thus "involves an assessment of an inmate's *current* dangerousness." (*Ibid.*) Unless public safety requires a lengthier period of incarceration, the presumption is that parole must be granted. (*In re Shaputis* (2008) 44 Cal.4th 1241, 1257 (*Shaputis I*).)

A "parole release decision authorizes the Board . . . to identify and weigh only the factors relevant to predicting 'whether the inmate will be able to live in society without committing additional antisocial acts.'" (*Lawrence*, *supra*, 44 Cal.4th at pp. 1205-1206, quoting *Rosenkrantz*, *supra*, 29 Cal.4th at p. 655.) An inmate's failure "to gain insight or understanding into either his violent conduct or his commission of the commitment offense" is a relevant consideration in reviewing an inmate for potential release to parole.

13

(*Shaputis I*, *supra*, 44 Cal.4th at p. 1260.) Pursuant to Penal Code section 5011, subdivision (b), however, the Board "shall not require, when setting parole dates, an admission of guilt to any crime for which an inmate was committed." These rules follow from "the fundamental consideration in parole decisions," which is "public safety" (*Lawrence*, at p. 1205), not readjudication of the offense.

A conclusion that an inmate lacks insight into the commitment offense "is not some evidence of current dangerousness unless it is based on evidence in the record . . ." that legally may be relied upon. The Board "cannot rely on the fact that the inmate insists on his innocence; the express provisions of Penal Code section 5011 and section 2236 of Title 15 of the California Code of Regulations prohibit requiring an admission of guilt as a condition for release on parole." (*In re McDonald* (2010) 189 Cal.App.4th 1008, 1023 (*McDonald*).)

Our review is highly deferential. We do not review the decision of the Board *de novo* nor even consider whether it meets the substantial evidence test. Rather, if "'some evidence,'" a "modicum" of evidence, supports the Board's determination that the inmate currently poses an unreasonable risk to public safety, we must affirm. (*Rosenkrantz*, *supra*, 29 Cal.4th at p. 658.) Where, however, the information in a postconviction record supports only a finding that the inmate is rehabilitated and no longer poses a danger to public safety, and the Board does not dispute the petitioner's rehabilitative gains and has not "'related the commitment offense to current circumstances or suggested that any further rehabilitation might change the ultimate decision that petitioner remains a danger, mere recitation of the circumstances of the commitment offense, absent articulation of a rational nexus between those facts and current dangerousness, fails to provide the required "modicum of evidence" of unsuitability.'" (*McDonald*, *supra*, 189 Cal.App.4th at pp. 1022-1023, quoting *Lawrence*, *supra*, 44 Cal.4th at p. 1227.)

2. *Application of the "Some Evidence" Standard*

Under the foregoing authorities, the question before us is whether the record reveals "some evidence" supporting the Board's determination that Swanigan currently

poses an unreasonable risk to public safety.  Even applying this highly deferential standard, we find no evidence in the record that supports the Board's conclusion that Swanigan poses such a risk.

Swanigan is currently 55 years old.  He lacks any juvenile record and had no violent history or criminal convictions as an adult except the commitment offense.  He has no history of drug or alcohol abuse and has never belonged to a gang.  He has maintained an exemplary disciplinary record in prison for nearly two decades.  His psychological evaluation by the Board's psychologist disclosed no mental health issues and a "Low" risk profile.  Swanigan has parole plans that satisfied the Board and has taken numerous self-help and vocational training programs and received laudatory "chronos," representing positive evaluations from prison authorities.

The Attorney General, however, contends that the Board's denial of parole is supported by (1) the heinous nature of Swanigan's crime, (2) Swanigan's lack of insight by "his refusal to accept the causes of his criminal conduct," and (3) his lack of credibility, in lying to the Board when he admitted the crime before recanting.  We discuss each reason separately.

A.    *Nature of Commitment Offense*

The Attorney General argues that the murder was heinous because it was calculated and had a trivial motive.  (Tit. 15, § 2402, subd. (c)(1)(B), (E).)  Indeed, every first degree murder requires premeditation, and if this would disqualify a person from parole, no one convicted of first degree murder would ever be paroled.  Of course, that is not the law.  In any case, the crime itself, in which a verbal altercation culminated in one shot to the victim after which the assailant fled, is as "run of the mill" as a first degree murder case can be.  But even assuming that this murder was heinous, however, even a heinous commitment offense does not alone justify a denial of parole.  "[H]owever horrible the crime, it is an insufficient basis for the denial of parole unless there is an evidence-based, rational nexus between the offense and present behavior."  (*In re Hunter* (2012) 205 Cal.App.4th 1529, 1538 (*Hunter*).)  The Attorney General correctly asserts, on the other hand, that the motive for the shooting, that Como had failed to pay Swanigan

15

as promised for damage caused by Como to Swanigan's car, was trivial. Missing from the record, critically, is evidence that the Board could rely upon to make a connection between that trivial motive and the other circumstances of the crime and a finding of current dangerousness. Indeed, the Board lamented that it made the decision to deny parole *despite* Swanigan's positive postincarceration history and positive parole plans. In fact, the only specific evidence in the record before the Board that suggests how Swanigan would handle such an altercation in the future supports a finding that parole is appropriate. Dr. Pritchard described this situation as follows: "In 2009, [Swanigan] was assaulted by a peer and was able to maintain his composure and allow the correctional officers to manage the situation."

Finally, as in *Hunter*, Swanigan's crime was committed more than 30 years before the Board hearing. While a denial of parole may be based on the circumstances of the offense or other immutable facts such as the inmate's history, "some evidence will support such reliance *only* if those facts support the ultimate conclusion that an inmate *continues* to pose an unreasonable risk to public safety. [Citation.] Accordingly, the relevant inquiry for a reviewing court is not merely whether an inmate's crime was especially callous, or shockingly vicious or lethal, but whether the identified facts are *probative* to the central issue of *current* dangerousness when considered in light of the full record before the Board or the Governor." (*Shaputis I, supra,* 44 Cal.4th at p. 1255, citing *Lawrence*, *supra*, 44 Cal.4th at p. 1221.) This critical link is missing in the case before us. There is no evidence cited by the Board that Swanigan is likely to repeat such an action upon release to parole, particularly given the Board's acknowledgement of Swanigan's progress while incarcerated. (*Hunter*, *supra*, 205 Cal.App.4th at p. 1538.)

B.      *Lack of Insight*

The Attorney General argues that Swanigan lacks insight. But as Dr. Pritchard understood, if one does not admit committing the crime, one cannot have insight into committing it. Indeed, Dr. Pritchard did not consider Swanigan's refusal to confess as indicating dangerousness; he rated Swanigan in the lowest possible category of recidivism given the immutable fact of his criminal conviction. Perhaps more

16

importantly, the regulations that govern the Board's decisions expressly prohibit such consideration. "'[T]he conclusion that there is a lack of insight is not some evidence of current dangerousness unless it is based on evidence in the record'" upon which the Board can legally rely. (*In re Jackson* (2011) 193 Cal.App.4th 1376, 1390 (*Jackson*).) The Board "'cannot rely on the fact that the inmate insists on his innocence; the express provisions of . . . section 5011 and section 2236 of title 15 . . . prohibit requiring an admission of guilt as a condition for release on parole.'" (*Ibid*.)

"[L]ack of insight, like any other parole unsuitability factor, supports a denial of parole only if it is rationally indicative of the inmate's current dangerousness." (*Shaputis II*, *supra*, 53 Cal.4th at p. 219.) So even assuming Swanigan failed to show insight, the question remains: Did the Board rely on any facts that connect that lack of insight to the conclusion that Swanigan is currently dangerous? We believe not.

The Attorney General, citing *Shaputis II*, contends when a denial strains credulity, it shows a lack of insight such that the Board may properly deny parole. *Shaputis II*, however, did not involve a prisoner who denied guilt. Indeed, the *Shaputis II* Court acknowledged that the facts of that case did not implicate section 5011. The *Shaputis II* Court, however, in dictum, indicated that an implausible denial of guilt *may*, not shall, support a finding of current dangerousness, and that "it is not the failure to admit guilt that reflects a lack of insight, but the fact that the denial is factually unsupported or otherwise lacking in credibility." (*Shaputis II*, *supra*, 53 Cal.4th at p. 216.) In any case, the Attorney General's argument that Swanigan's denials were implausible is based simply on the immutable facts of the crime itself and the fact of his conviction, not a pattern of behavior or a denial of physical evidence that connected Swanigan to the crime.

Even accepting the Attorney General's contention that Swanigan's denial that he committed the crime is implausible because witnesses testified that he was the assailant, that conclusion is untethered to any determination by the Board that Swanigan is currently dangerous. (*Lawrence*, *supra*, 44 Cal.4th at p. 1227.) It is based solely on

17

the denial itself.[10]  In contrast, in *Shaputis II*, the inmate's lack of insight, after a lengthy history of domestic violence culminating in the shooting death of his second wife, was demonstrated by "psychological reports . . . ; his own statements about the shooting, which failed to account for the facts at the scene or to provide any rational explanation of the killing; his inability to acknowledge or explain his daughter's charge that he had raped her; and his demonstrated failure to come to terms with his long history of domestic violence in any but the most general terms."  (*Shaputis II*, *supra*, 53 Cal.4th at p. 216.)  In evaluating whether an inmate evidences insight into the crime, the *Shaputis II* Court discussed the interplay between the regulations, which do not explicitly discuss insight but instead "direct the Board to consider the inmate's 'past and present attitude toward the crime' (tit. 15, § 2402, subd. (b)) and 'the presence of remorse,' expressly including indications that the inmate 'understands the nature and magnitude of the offense' (§ 2402, subd. (d)(3)). These factors fit comfortably within the descriptive category of 'insight.'"  (*Shaputis II, supra,* at p. 218.)  When Swanigan attempted to demonstrate such an understanding of the crime at the 2009 hearing, however, the Board rejected his statements as insufficient without an admission that he committed the crime. Swanigan attempted to accept responsibility for Como's death at least twice, in the 2009 and 2014 hearings.  At the 2009 hearing, the Board expressed frustration that Swanigan would "accept responsibility" and express remorse for Como's death, but still deny that he committed the crime.  At the 2012 hearing, the Board went further and told Swanigan precisely what he needed to do in order to earn his release to parole, saying, "So what we need to do then is consider whether or not there are any other circumstances coupled with the noted immutable circumstances that would lead us to the conclusion that Mr. Swanigan poses a continued threat to public safety, and we find that he does for the following reasons.  First of all, we noted that Mr. Swanigan has failed to show adequate signs of remorse and accept full responsibility for his criminal actions.  He continues to

---

[10]     The Attorney General asserted at oral argument that the denial is evidence that Swanigan will not comply with parole authorities upon his release to parole.  The Board did not articulate this as a basis for denying parole.

deny responsibility for the life crime in spite of a record that clearly identified him as the perpetrator with eyewitnesses. . . . We also noted in terms of the remorse, you did verbalize remorse, for example, for the loss of the father of the victim's son. However, when I inquired further about the steps that you had taken to alleviate any pain and suffering of the victims, you indicated that you had not." The 2014 Board did not address that Swanigan attempted to comply with each of these requirements while maintaining his innocence, and did not tie Swanigan's statements in any way to a conclusion that Swanigan remains dangerous.

*Jackson*, *supra*, 193 Cal.App.4th 1376, provides a factual background similar to Swanigan's. In *Jackson*, the petitioner was convicted of the 1981 murder of his former girlfriend Sharon Wade, who was shot twice. Jackson consistently denied that he committed the crime. At trial, the primary evidence against Jackson included witnesses who testified that Jackson and Wade had an acrimonious relationship, that Jackson was furious that she was seeing another man, and that on the night of the shooting Jackson and Wade had an angry confrontation during which Jackson threatened to kill her and "shoved" her in the face. (*Id*. at p. 1380.) A witness to the shooting heard an argument in which the shooter said "'I should have killed you earlier,'" after which he fired two shots into the driver's side of Wade's car. (*Ibid.*)

At his eighth parole hearing, Jackson declined to discuss the crime, and the Board received evidence of his pre-incarceration social, work, and criminal history. Jackson had discussed, in connection with a psychological evaluation, his responsibility for the crime, stating that " he was responsible for Wade's death because he contributed to the circumstances that led to her death." (*Jackson*, *supra*, 193 Cal.App.4th at p. 1381.) The Board found Jackson unsuitable for parole, concluding that " [y]ou've taken responsibility for being jealous, but it's impossible for this panel to assess your insight into this crime because you deny committing the crime. Now, you have the right not to discuss this crime with the panel. You exercised that right today. You also have the right not to admit the crime, but you're actively denying the crime, and the panel does not have to believe your denial of committing this crime nor your explanation of taking

19

responsibility. The panel finds, indeed, that you have not taken responsibility for this commitment offense." The Board further stated to Jackson: "'You've shown a lot of regret for being incarcerated. You showed precious little remorse for the death of Ms. Wade, whom you said you cared so much about.'" (*Id.* at p. 1383.)

The Board denied parole. Jackson filed a petition for writ of habeas corpus in the superior court, which denied the petition, as did the Court of Appeal. The California Supreme Court issued an order requiring the Attorney General to show cause before the Court of Appeal "'why the Board of Parole Hearings' decision to deny petitioner parole . . . did not violate Penal Code section 5011, subdivision (b), and California Code of Regulations, title 15, section 2236, by relying, either directly or indirectly, on petitioner's refusal to admit guilt as a factor demonstrating unsuitability for parole.'"[11] (*Jackson*, *supra*, 193 Cal.App.4th at p. 1383.)

As in this case, the Attorney General in *Jackson* contended that the Board did not deny Jackson parole because of his refusal to admit his guilt. Rather, the Board "justifiably denied Jackson parole due to his lack of insight into the crime, his failure to take responsibility for it, and his lack of remorse." (*Jackson*, *supra*, 193 Cal.App.4th at p. 1389.) In granting the petition, the Court of Appeal concluded, however, that the Board's stated findings that Jackson lacked insight into the crime, failed to take responsibility for it, and did not have remorse, were based solely on Jackson's refusal to admit that he shot and killed Wade. Because basing a parole determination on that evidence is expressly prohibited by section 5011, subdivision (b) and section 2236 of title 15, the Board thus lacked any evidence to support its decision that Jackson was unsuitable for parole. (*Jackson*, at p. 1391.)

The same is true here. The Board relied on Swanigan's refusal to admit guilt to conclude he did not have insight or show remorse. But this, the Board was not permitted to do. Moreover, as in *Jackson*, Swanigan's case is not one in which his claim of innocence is physically impossible or strains credulity, or even is inconsistent with the

---

[11] Although the petition in this case includes a discussion of section 5011, and our order to show cause cited *Jackson*, the Attorney General failed to address section 5011 or section 2236.

20

evidence presented at trial. No physical evidence tied Swanigan to the murder. The assailant covered his face with a bandana. Two of the witnesses were young children, and one adult witness's identification, as acknowledged by the trial court when it excluded the evidence of the identification, was potentially tainted by presentation with an individual photo of Swanigan after the witness said that the photo of Swanigan from the six-pack identification exhibited discrepancies from the person he saw. Eyewitness identification, particularly of a stranger, is fraught with potential for mistake. "It is no news that eyewitness identification in criminal cases is a problem; it is an old and famous problem. Judges and lawyers have long known that the identification of strangers is a chancy matter, and nearly a century of psychological research has confirmed this skeptical view." (Gross, *Loss of Innocence: Eyewitness Identification and Proof of Guilt* (1987) 16 J. Legal Stud. 395, fn. omitted.) This is particularly true when as here the identification is made some time after the event, and when the assailant's face is obscured. (*Id.* at p. 399 ["the most dramatic decline in accuracy occurs within the first few hours"].)

In addition, Swanigan presented a defense. He testified that he was elsewhere and provided corroborating testimony from his girlfriend, and he has maintained for over 30 years, with the one exception discussed herein, that he did not commit the murder.

As was the case in *Hunter*, *supra*, 205 Cal.App.4th 1529, in the case before us the Board did not articulate a rational basis for finding Swanigan unsuitable for parole that is supported by "some evidence" that Swanigan will pose an unreasonable risk to public safety if paroled. As in *Hunter*, "[t]here is no evidence that his mental state (including his remorse, acceptance of responsibility, or insight) indicates current dangerousness. . . . In short, the record fails to provide any rational basis for finding [Swanigan] unsuitable for parole." (*Id*. at p. 1544.)

### C. *Lack of Credibility*

Finally, the Attorney General argues that Swanigan lied to the Board by admitting that he killed Como and then recanting, and that as a result, the Board's conclusion that Swanigan was not credible justifies the decision denying parole. The Board

asserted that this lack of credibility gives rise to a finding of current dangerousness. The Board did not address, however, that at least two prior Boards had informed Swanigan, including at least 10 times during his 2012 hearing alone, "until you get to that point [of Swanigan's recognizing his role in the commitment offense and further examining why he committed the crime], we would consider you a continuing risk to public safety," precluding parole. Nor did it address its own notice advancing the parole hearing, which implied that Swanigan might be paroled if he admitted the crime.

Given the Board's unauthorized insistence at multiple parole hearings that it would not consider granting parole until Swanigan admitted the crime, the apparent confirmation of that view by the deputy district attorney at the 2009 hearing, and the statement in the order setting Swanigan's parole hearing that he would be required to discuss the life crime, it would take more than normal human fortitude to resist forever. But a lack of such extraordinary fortitude is not some evidence that a person is an unreasonable risk to public safety or is currently dangerous. Indeed, the Board acknowledged the predicament in which it placed Swanigan, saying, "You feel like you're in a Catch-22 situation is if I don't tell them I did it, even if it's a lie, I'm never going to get the heck out of here, right." The 2012 Board, the deputy district attorney, and even the notice granting Swanigan's 2014 hearing had, in fact, told Swanigan just that. His compliance with that insistence, briefly made and quickly withdrawn, is not "some evidence" that Swanigan's release would pose a current threat to public safety.

Nor can the Board's insistence that Swanigan, who denies committing the offense, both "be honest" and "accept responsibility" for his actions, be reconciled with section 5011, subdivision (b) and section 2236 of title 15, which expressly preclude conditioning parole on an admission of guilt.

For these reasons, although our review "'is limited to ascertaining whether there is some evidence in the record'" to support the Board's decision, we conclude that the record lacks some evidence—even a "'modicum'" of permissibly considered evidence— to support the denial of parole. (*Shaputis II*, *supra*, 53 Cal.4th at p. 210, quoting *Rosenkrantz*, *supra*, 29 Cal.4th at p. 677.)

22

**DISPOSITION**

The petition for a writ of habeas corpus is granted and the decision of the Board of Parole Hearings is hereby vacated. The Board is directed to conduct a new parole suitability hearing consistent with due process of law and with this decision. (*In re Prather* (2010) 50 Cal.4th 238, 244.)

<u>CERTIFIED FOR PUBLICATION</u>.

ROTHSCHILD, P. J.

We concur:

CHANEY, J.

MOOR, J.[*]

---

[*]    Judge of the Los Angeles Superior Court , appointed by the Chief Justice pursuant to article VI, section 6 of the California Constitution.