Filed 2/24/26  In re E.C. CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re E.C., a Person Coming Under the Juvenile Court Law. | B345544 (Los Angeles County Super. Ct. No. 24CCJP04058) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. C.C., Defendant and Appellant. | |

APPEAL from the jurisdictional and dispositional orders of the Superior Court of Los Angeles County, Debra L. Losnick, Judge.  Affirmed.

Liana Serobian, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Jacklyn K. Louie, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

C.C. (mother) appeals from the juvenile court's orders asserting jurisdiction over her child E.C. and removing E.C. from mother's care. Mother argues the rulings violated the federal Violence Against Women Act (VAWA), and were not supported by substantial evidence. Mother forfeits her VAWA argument for lack of legal citations. Substantial evidence of domestic violence between mother and father M.B., as well as mother's unresolved mental health issues, justified jurisdiction and removal. Accordingly, we affirm.

## BACKGROUND

### 1. *Prior child welfare history*

In 2015, before E.C. was born, the juvenile court asserted jurisdiction over E.C.'s two siblings based on sustained allegations of domestic violence between mother and father, including mother attacking father, and mother's and father's history of illicit drug use. In 2017, the juvenile court sustained an additional petition alleging a history of illicit drug use and current drug use by mother. Mother's and father's parental rights to E.C.'s two siblings were terminated in 2018.

In July 2024, shortly after E.C.'s birth, the Los Angeles County Department of Children and Family Services (DCFS) received a referral of general neglect. Mother had tested positive

2

for methamphetamine during prenatal care, although she was negative at birth, as was E.C. DCFS investigated and deemed the referral inconclusive.

On November 2, 2024, DCFS received a referral regarding E.C. alleging emotional abuse and caretaker absence/incapacity. The caller reported mother had called law enforcement and told them she had a newborn in her care and needed help. Mother said she was suicidal and had drunk a gallon of vodka to kill herself. When police arrived mother was uncooperative and was heavily intoxicated, screaming and yelling, throwing objects, and spitting in the caller's face. E.C. was on the couch. Police found a pipe for methamphetamine in the home as well as empty vodka bottles. Mother was arrested for battery on a police officer and child endangerment.

DCFS investigated and concluded the situation had stabilized. The home visit presented no concerns, and mother had a support system and service providers in place. DCFS deemed the allegations of emotional abuse unfounded, and the allegations of caretaker absence inconclusive.

### 2. *Current referral and investigation*

On December 7, 2024, DCFS received a referral regarding E.C., now five months old. According to the referral, mother's neighbor had called the police because mother was destroying property. Father reported that mother was struggling with post-partum depression. Maternal grandmother said father was a drug addict and homeless. Maternal grandmother further reported mother earlier that day was intoxicated and had said she wanted to kill herself.

DCFS began an investigation. Paternal grandfather told social workers that father had been drug free for four or five

years.  He said mother had mental health issues but no drug use of which he was aware.

Mother's apartment manager, Maria, said mother had been causing trouble in the four days leading up to the referral.  Maria said mother had a mental health crisis, vandalized items in the apartment building, and kicked the window of a neighbor's house.  Maria said mother had threatened and terrorized neighbors.  Maria showed social workers a video of mother screaming and kicking the neighbor's window.  Maria said neighbors had told her they had heard mother say she was going to kill the baby.  Maria said mother and father often engaged in domestic violence, but a week later would be back together again.

The next day, Maria and her supervisor opened the door to mother's apartment when mother did not answer.  A social worker observed the home was damaged and in disarray with belongings scattered and broken.

A few days later, social workers met with mother at mother's apartment, which had now been cleaned up.  Mother said she had not had a mental breakdown the day of the referral.  She said father and paternal grandfather had taken E.C. to a tree-lighting ceremony, and mother remained at home with a friend.  Mother and her friend became intoxicated and the friend started throwing and breaking things.  Mother got into a physical altercation with the friend and police arrived.  The front door was stuck for some reason so mother was unable to open it to let the police in.  When the police left the friend jumped out the window.

Mother said she planned not to drink anymore.  The social workers did not observe any marks or bruises on E.C. other than minor diaper rash.

When social workers spoke to father he denied drug use or any involvement in domestic violence. In a later conversation, he said mother had mental health issues but did not elaborate.

On December 19, 2024, apartment manager Maria sent the social workers a video of mother and father arguing as they carried E.C. into the apartment. According to the social workers' description of the video, mother and father could be heard arguing inside, although they could not be seen on the video at that point. The "commotion sounded violent and aggressive in nature" but it was unclear if mother and father were hitting one another. (Boldface omitted.)

On December 22, 2024, DCFS received information that father had gone to mother's apartment to drop off "custodial paperwork" regarding E.C. He and mother argued, then father "strangled" mother for 30 seconds. E.C. was asleep in another room. No drugs or alcohol appeared to be involved. Mother had since moved into a shelter for victims of domestic violence.

Mother told DCFS father had come to the apartment to deliver E.C.'s birth certificate and medical records at mother's request. Mother and father argued, and mother called him a "bitch." Father accused her of filming him and then choked her. Mother had bruises on her neck and arm, of which a social worker took pictures. Mother said apart from this incident, father had not hit mother and their last episode of domestic violence had been seven years earlier.

On January 13, 2025, the shelter reported to DCFS that mother had left with E.C. "against program advice." Mother had told the shelter she had to go to Long Beach because her uncle had been shot. The shelter informed her if she left, she would be expelled from the program. Mother then said she wanted to leave

because she was afraid of the wildfires. Mother became "increasingly irritable and aggressive." At one point she swung the stroller containing E.C. so hard that it tipped, and E.C. would have fallen out had she not been strapped in.

When mother left, shelter staff looked in mother's room and found two empty tequila bottles, one empty whiskey bottle, and four empty beer cans. Shelter staff reported that during mother's stay, she displayed fluctuations of aggressive behavior, and was often rude to, and defensive with, staff.

Apartment manager Maria told DCFS mother had been texting her with threats of harm, blaming Maria for DCFS's involvement.

### 3.   *Detention*

On December 31, 2024, DCFS filed a petition under Welfare and Institutions Code[1] section 300 seeking to detain E.C. Under section 300, subdivisions (a), (b)(1), and (j), the petition alleged mother and father had a history of violent altercations in the presence of E.C., including the incident in which father had choked mother and mother had sustained bruises on her neck and arms. The petition alleged on prior occasions mother and father argued in E.C.'s presence. The petition noted mother and father had lost parental rights over E.C.'s siblings because of domestic violence.

Also under section 300, subdivision (b)(1), the petition alleged mother had "a history of mental and emotional problems including homicidal ideation and exhibiting aggressive behaviors." The petition alleged mother had been heard saying

---

[1] Unspecified statutory citations are to the Welfare and Institutions Code.

6

she was going to kill E.C., that mother had vandalized items in the home and kicked a neighbor's window, and had threatened other neighbors.

At the detention hearing on January 15, 2025, mother presented letters confirming mother's participation in mental health services. She testified the shelter had not given her useful referrals and would not answer her questions about a wildfire safety plan. She did not know why alcohol bottles were in her room at the shelter. She denied vandalizing her apartment or threatening to kill E.C. She reported receiving therapy, was in recovery maintenance for her sobriety, and was taking Lexapro and Wellbutrin.

A social worker testified mother never indicated she was afraid at the shelter, and told the social worker she was doing well and felt connected with the community there. Mother had not told DCFS she was leaving the shelter. The social worker said mother was unable to control her aggression, and displayed outbursts of depression and aggression every few days. DCFS could not rely on her to be in communication with them, because it all depended on how she felt on a given day.

The juvenile court said it did not wish to separate E.C. from mother at such a critical point in E.C.'s life, but wanted commitments from mother. The court ordered mother to avoid alcohol and cooperate with DCFS and E.C.'s counsel. The juvenile court ordered E.C. detained from father and released to home of mother.

### 4. *Jurisdiction report*

The jurisdiction report, filed February 13, 2025, indicated that since mother had left the shelter she had had unstable

housing, moving to at least five different motels and changing her telephone number four times.

According to the report, a DCFS dependency investigator met with mother and E.C. on February 6, 2025. The investigator observed no signs of abuse or neglect on E.C. Mother was alert and attentive to E.C.

Mother now denied father had been physically violent with her. She said she had argued with father, but he had never choked her. Mother denied drug abuse. She said she had anxiety and depression and took medication to treat those conditions. She had posttraumatic stress disorder and was seeing a therapist, but she denied being suicidal or homicidal. Mother said she had been sober from methamphetamine for years, although she could not remember the beginning date of her sobriety.

Mother explained she broke her neighbor's window by accident. She got drunk with a friend, and she "maybe did blackout." She could not remember everything that happened, but was not destroying her apartment.

Father did not make himself available to the dependency investigator. Father would call the social worker at random times and aggressively express his disappointment with DCFS, but when DCFS attempted to address his concerns, father would hang up.

Maternal aunt (misidentified in the jurisdiction report as maternal grandmother) said she saw father hit mother years earlier, when maternal aunt was a teenager. In the past few years, she had seen marks and bruises on mother's neck, and knew father left those bruises. She said father was controlling and manipulative. She believed father ruined things when

mother was getting back on track, but mother was now doing well. She confirmed mother had anxiety and depression for which she took medication and saw a therapist. Maternal aunt denied mother was suicidal or would ever hurt E.C.

Maternal aunt said on one occasion, she went to mother's apartment when mother was not there and found father there when he was not supposed to be. He left his backpack which contained methamphetamine.

DCFS reported mother presented with visible anxiety signs, including shaking, sweating, heavy breathing, pacing, asking multiple questions and making multiple statements at the same time, and deflecting questions directed to her. DCFS did not believe the symptoms were caused by substance abuse, but by mental health issues.

DCFS "applaud[ed]" mother for keeping DCFS informed of her and E.C.'s whereabouts, and acknowledged that E.C. appeared healthy, clean, and free from marks and bruises. DCFS nonetheless recommended E.C. remain under juvenile court supervision "as [mother] addresses her emotional and mental health needs."

### 5. *Request for change of order and subsequent reports*

On February 19, 2025, DCFS filed a request for a change of order under section 385 seeking to detain E.C. from mother. According to the request, mother had been arrested for petty theft of baby formula and was in police custody. Mother had left E.C. with paternal grandfather before committing the theft.[2]

---

[2] The last minute information further states DCFS suspected that mother and father were still romantically involved as of February 2025. It is not clear from the record how DCFS

A last minute information filed February 26, 2025, stated that according to booking records, mother had been released from custody on February 21, but was taken back into custody on February 23.  The last minute information noted mother had two active criminal cases, one for battery and child endangerment, and one for theft with a prior theft conviction.

An interim review report filed March 20, 2025 stated DCFS had placed E.C. with paternal grandfather.  DCFS had been able to interview father, who denied engaging in domestic violence and said mother would get emotional and lie to the police about him.  He denied choking mother, and said at that time, she was "buzzed" and having an emotional breakdown.

The report indicated mother had pleaded no contest to the petty theft charge and received a suspended three-year sentence.  Mother's drug tests were a mix of negatives and no-shows.  Father had one positive test for marijuana, and the other tests were negative or no-shows.

DCFS expressed continued concern about mother's mental health, and referred to extreme mood swings, defensiveness, extreme rationalization of her actions, being unfocused, and being verbally confrontational.  Mother had told DCFS she wanted to stop taking her medication and try a homeopathic approach, but it was unclear her psychiatrist had approved this treatment.

A last minute information filed April 2, 2025 reported mother had another negative drug test followed by a no-show.  Mother said she missed the test because of transportation issues,

reached that conclusion, and we do not consider that conclusion for purposes of this appeal.

but DCFS noted she had not had transportation issues getting to appointments before.  Mother also missed a required appointment to obtain funding from the county.

Mother informed DCFS she was living in a domestic violence shelter and was able to take E.C. back, but she declined to give DCFS an agency name or contact person to verify this. Mother had been visiting E.C. at a DCFS office, with no concerns for abuse or neglect reported.

### 6.     *Adjudication and disposition*

The juvenile court adjudicated the section 300 petition on April 2, 2025.  The court found apartment manager Maria's statements credible.  The court noted the video of mother and father fighting, mother's arrest,[3] and mother's statement that father had choked her while E.C. was nearby.  The court sustained all allegations.

As for disposition, the court declined to release E.C. to mother or father.  The court cited the "ongoing domestic violence between the parents."  The court ordered reunification services for mother and father and granted monitored visitation.

Given the juvenile court's order removing E.C. from both mother and father, the court took DCFS's section 385 request for a change of order off calendar.

---

[3]  It is not clear if the juvenile court was referring to mother's November 2024 arrest for battery against a police officer and child endangerment, mother's February 2025 arrest for petty theft, or both.

Mother timely appealed from the jurisdictional and dispositional orders.[4]

## DISCUSSION

Mother challenges the jurisdictional findings against her as well as the dispositional order removing E.C. from her care.

### A. Substantial Evidence Supported Assertion of Jurisdiction

The juvenile court asserted jurisdiction under section 300, subdivisions (a), (b)(1), and (j).

Section 300, subdivision (a) requires a showing that "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian."

Section 300, subdivision (b)(1) requires a showing that "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of" one or more enumerated circumstances, including "[t]he failure or inability of the child's parent or guardian to adequately supervise or protect the child"; "[t]he willful or negligent failure of the child's parent or guardian to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left"; or "[t]he inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse." (§ 300, subd. (b)(1)(A), (B), (D).)

---

[4] We dismissed father's separate appeal pursuant to *In re Phoenix H.* (2009) 47 Cal.4th 835, 838.

12

Section 300, subdivision (j) requires a showing that "[t]he child's sibling has been abused or neglected, . . . and there is a substantial risk that the child will be abused or neglected . . . ."

" 'In reviewing the jurisdictional findings . . . , we look to see if substantial evidence, contradicted or uncontradicted, supports them. [Citation.] In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court.' [Citations.]" (*In re R.T.* (2017) 3 Cal.5th 622, 633.)

As an initial matter, DCFS contends mother's challenge to jurisdiction is nonjusticiable because the sustained counts against father are uncontested. (*In re J.C.* (2014) 233 Cal.App.4th 1, 3 ["Because the juvenile court assumes jurisdiction of the child, not the parents, jurisdiction may exist based on the conduct of one parent only. In those situations an appellate court need not consider jurisdictional findings based on the other parent's conduct."].) We nonetheless exercise our discretion to reach the merits of mother's challenge to jurisdiction, because "the jurisdictional finding serves as the basis for dispositional orders that are also challenged on appeal." (*Id.* at p. 4.)

Mother argues the juvenile court's jurisdictional findings violated VAWA, because she was "a victim of domestic violence and took appropriate measures to remove E.C. from being exposed to violence by entering a shelter and separating from father." Mother does not cite any provisions of VAWA or case law interpreting VAWA to support her position, and therefore forfeits the argument. (*In re Tobacco Cases II* (2015) 240 Cal.App.4th

13

779, 808 [" 'a party's failure to perform its duty to provide . . . legal authority in support of a contention may be treated as a waiver of the issue' "].)

Mother also argues the jurisdictional findings are not supported by substantial evidence. She contends the findings regarding domestic violence are unsupported by the record, because the sole recent episode of domestic violence was perpetrated by father, and mother took appropriate steps in response including calling the police and moving into a domestic violence shelter with E.C. Mother asserts the other episodes of violence happened back in 2015 when the juvenile court took jurisdiction over E.C.'s siblings, and nothing in the record indicates domestic violence between that time and father attacking her in December 2024.

Mother also contends there is no substantial evidence her mental health issues posed a risk to E.C. Mother cites case law holding a court cannot presume risk to a child from a parent's mental illness or cognitive impairment. (See *Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415, 1424.) Mother asserts the record shows she has acknowledged her mental health issues and has sought help for them.

There was substantial evidence domestic violence was an ongoing problem for mother and father. In addition to the December 22, 2024 incident when father choked mother, mother's apartment manager reported mother and father often engaged in domestic violence but then got back together. DCFS saw the apartment manager's video from December 19, 2024 in which mother and father argued, and although the social workers could not see mother and father on the video, the social workers described hearing a "commotion [that] sounded violent and

14

aggressive in nature." (Boldface omitted.) Although mother is correct the findings of domestic violence leading to the removal of E.C.'s siblings were a decade old, given the more recent incidents those earlier findings further supported the juvenile court's finding mother and father have unresolved issues of domestic violence between them.

Mother is correct she called law enforcement and moved into a domestic violence shelter, all of which is laudable. It is concerning, however, that in later DCFS reports, she changed her story and said father had not in fact choked her, suggesting she either was not being forthcoming, or still had not completely acknowledged the severity of the issues between her and father.

As for mother's mental health issues, there was substantial evidence those issues posed a risk to E.C. The referral that led to these proceedings concerned mother wrecking her apartment, in what she herself acknowledged might have been an alcohol-caused "blackout." Her apartment manager stated this incident followed several days in which mother had vandalized the apartment building, kicked the window of a neighbor's house, and threatened her neighbors. Video taken by the apartment manager corroborated mother had broken a neighbor's window and was screaming at that time. Social workers interacting with mother reported her extreme mood swings, defensiveness, and extreme rationalization of her actions, as well as mother being verbally confrontational. The staff at mother's shelter reported mother's aggressive behavior including swinging E.C.'s stroller so violently E.C. would have fallen out had she not been strapped in. The staff also found empty liquor bottles in mother's room. This all supported a finding that mother not only had unresolved

15

mental health issues, but also, that those issues manifested in aggressive and destructive ways.

In sum, substantial evidence supported the juvenile court's jurisdictional findings.

## B. Substantial Evidence Supported Removal of E.C. From Mother

Section 361, subdivision (c) provides that "[a] dependent child shall not be taken from the physical custody of their parents . . . unless the juvenile court finds clear and convincing evidence" that, *inter alia*, "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (§ 361, subd. (c)(1).)

Although we review the juvenile court's dispositional orders for substantial evidence, " 'appellate review of the sufficiency of the evidence in support of a finding requiring clear and convincing proof must account for the level of confidence this standard demands. . . . [W]hen reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true. Consistent with well-established principles governing review for sufficiency of the evidence, in making this assessment the appellate court must view the record in the light most favorable to the prevailing party below and give due deference to how the trier of fact may have evaluated the credibility of witnesses,

resolved conflicts in the evidence, and drawn reasonable inferences from the evidence.' " (*In re V.L.* (2020) 54 Cal.App.5th 147, 155, quoting *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995–996.)

Mother notes the juvenile court released E.C. to her at the detention hearing, and DCFS did not recommend removal until mother was arrested for petty theft. Mother cites case law holding that the mere fact of a parent's incarceration does not justify removal. (See *In re J.N.* (2021) 62 Cal.App.5th 767, 777–778.) Mother further argues the juvenile court did not "evaluate[ ] the section 361 factors or consider[ ] whether any reasonable alternative to E.C.'s removal from mother existed, such as an order for mother to continue in her shelter and/or separate housing from father, while complying with the court's orders and cooperating with [DCFS], as she was previously doing."

The juvenile court's stated reason for removing E.C. from mother was not the arrest for petty theft, but the "ongoing domestic violence between the parents." As addressed in our discussion of the court's jurisdictional findings, *ante*, there was substantial evidence of that violence, which similarly supported the removal order even under the higher clear and convincing standard. It is true the juvenile court did not order E.C. removed at the detention hearing, but mother cites no authority that a court cannot change its mind following further investigation. As we have noted, after the detention hearing mother changed her story and said father had not choked her, causing concern that she was either not being forthcoming about the issues between her and father or was failing to comprehend the gravity of those issues.

17

Although not expressly cited by the juvenile court as a basis for removal, the evidence of mother's unresolved mental health issues, in particular her aggressive and sometimes destructive behavior and problems with alcohol, similarly supported removal.

## DISPOSITION

The juvenile court's jurisdictional and dispositional orders are affirmed.

NOT TO BE PUBLISHED.


BENDIX, J.


We concur:



ROTHSCHILD, P. J.



WEINGART, J.